AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
### Western District of Washington

FILED
LODGED ___ ENTERED
___ RECEIVED

APR 26 2011

AT SEATTLE
CLERK U.S. DISTRICT COURT
BY WESTERN DISTRICT OF WASHINGTON
DEPUTY

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
**See Attachment A** )
)
)

Case No. MJ11-192

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A, for a list of places to be searched which is incorporated herein by reference.

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B, for a list of items to be searched for and seized, which is incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| | See Attachment C, for a list of violations, which is incorporated herein by reference. |

The application is based on these facts:

See attached Affidavit of Special Agent Bryan P. Winger, attached hereto and incorporated herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SA BRYAN P. WINGER
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 26 April 2011

_____
*Judge's signature*

City and state: Seattle, Washington

Brian A. Tsuchida, United States Magistrate Judge
*Printed name and title*

## ATTACHMENT A
## PLACES TO BE SEARCHED

**12614 NE 140th St, Kirkland, WA:** This is a single-family two story house. The house is blue in color, with white trim and a dark-colored composite roof. The house is on the north side of NE 140th St and faces to the south. It has two white south-facing garage doors on the right (east) side of the house as you are looking at it from the street. The house number, 12614, is on a white board with dark lettering, displayed above the left garage door (as facing the house from NE 140th St). The house has a large front porch that wraps around the west side of the house. The front door is accessed from the porch, closer to the center of the house. The door is dark colored, with a window in the upper portion.

**A Black 2007 GMC Yukon, Washington license AAD7449** and a Vehicle Identification Number (VIN) of 1GKFK63897J270569.

**A White 2006 Lexus GS44D, Washington license AAN5624,** and a Vehicle Identification Number (VIN) of JTHBN96S065001716.

**5960 Terrace View Lane SE, Apt. H-206, Auburn, Washington, and detached Garage #62:** This is a three story apartment building located at the south end of the Belara at Lakelands apartment complex. The building is beige and yellow and has a dark charcoal colored composition roof. The numbers 5960 are clearly displayed on the west side of building H in beige numbers with a black background. Also on the west side next to the building is covered parking with stone colored columns and a cream colored aluminum roof. On the north side of the building in the center near the roof, the numbers 5960 are displayed again in beige letters on a black background. To the left (east) of center on the north side is a large sign displaying the letter H in beige lettering with a black background. Access to the apartments in building H can be gained on either the north or south side of the building through hallways located at the east and west of center. In order to gain access to apartment H-206 from the north side of the building, one can enter through the hallway located to the west of center. Apartment H-206 will be the second door on the left (east) side of the hallway. The door is a white door with the numbers 206 displayed at the top of the door in beige numbers on a black background. If one enters the west hallway from the south side of building H, concrete stairs with a black railing lead to apartment 206, which is the first door on the right (east) side of the hallway.

Garage #62 is a white garage door unit that is located directly to the north of building H, past building J, and building K in a separate building structure that only houses garage units that is closer to the center of the apartment complex. The south side of the structure houses garage units #32 on the west side to #48 on the east side. The northwest side of the structure begins with unit #49. Garage #62 is located on the north side of the structure further towards the west of center and faces towards building L. The structure is composed of single story garage units that are beige in color on the bottom with white garage doors, and yellow A frames with white trim and a dark charcoal colored composition roof. Garage number 62 is clearly marked in beige colored numbering on a black background above the white garage door designated for the unit.

**A White 2006 Ford Truck, Missouri license 2CE972** and a Vehicle Identification Number (VIN) of 1FTRF14W16KA83302.

**A Black 2002 Volkswagen Golf, Washington license 596ZAT**, and a Vehicle Identification Number (VIN) of 9BWDE61J024007500.

**4003 SW 98th Street, Seattle, WA:** This is a single-family two story house. The house is dark beige in color with a gray composition roof. The house is located on the south side of 98th Street and faces to the north. It has two white north-facing garage doors on the right (west) side of the house as you are looking at the house from 98th Street. There is a white brick chimney on the left (east) side of the house along with a satellite dish. The house number, 4003, is clearly displayed in large black colored numbers to the left of the front door. Steps lead from the driveway to the front door, with black iron hand rails located in a small porch area around the front door. The front door is white in color and is a double-door that is located towards the center of the house, facing north. There is a large exterior light located directly over the garage doors.

**A White 2006 Dodge Caravan, Washington license B59536L** and a Vehicle Identification Number (VIN) of 1D4GP23R06B539587.

**8805 35th Avenue SW, Seattle, WA:** This is a single story house with a lower level garage/basement area. The house is light yellow in color with greenish blue trim and a gray composition roof. The front of the house faces to the east at 35th Avenue SW. It has a single car garage that is light yellow with greenish blue trim facing to the north at Trenton Street. A downward sloping driveway leads to the garage door entrance on the north side of the residence. There is a brick chimney and a large television antenna located on the north side of the roof. The house number, 8805, is clearly displayed in

Attachment A
Application for Search Warrant
Page 2

gold colored numbers to the left of front door. A gold colored mail slot is located below the house numbers. As one approaches the residence from the sidewalk located along 35th Avenue SW, steps with greenish blue iron hand rails lead to the front door. At the top of the first flight of stairs, a white colored light pole is located to the right. A second set of steps that also have a greenish blue iron hand rail lead to a small front porch area and the front door. The front door is dark in color, faces to the south, and is covered with a black iron storm door.

**A Burgundy 2007 Chevy Tahoe, Washington license ACN5641** and a Vehicle Identification Number (VIN) of 1GNFK13077R319043.

**6300 39th Avenue South, Seattle, WA**: This is a single-family two story house. The house is brown in color on the lower level and beige with brown vertical trim on the upper level. The house has a dark-colored composite roof. There are no house numbers visibly displayed on the house itself, and no house numbers are visible while looking at the house from the street. The front of the house faces to the west at 39th Avenue South. A driveway with a slight incline leads from 39th Ave South to a garage door located on the south side of the house. Concrete steps that are located on the left (north) side of the driveway lead to a front porch area. A second set of stairs with cedar hand rails lead to the front porch, which is enclosed by a cedar railing. The front door, which is located in the center of the house, is dark brown with a black iron storm door. To the left (north) of the front door at ground level is a small window which is covered by black iron rails. The north perimeter of the yard is enclosed by a cedar fence. In the upper level to the left (north) of the front door, there is a large window. A chimney extends from the roof on the left (north) side of the house. Directly above the front entrance door, there is a medium sized window. Above the garage door in the upper right (south) side of the . house there is a smaller window. The south perimeter of the yard is also enclosed by a cedar fence.

**13327 Puget Sound Blvd, Edmonds, WA**: This is a single-family two story house. The house is brown in color, with brown trim and a dark-colored composite roof. The house is on the east side of Puget Sound Blvd and faces to the west. There are no visible house numbers displayed on the house itself, the house number, 13327 are clearly displayed on the mailbox, which is located at the end of a shared driveway that leads to the house from Puget Sound Blvd. The front door is red in color and is located on the left (north) side of the house. To the right (south) side of the house on the lower level, there is a sliding glass entrance door. There are small windows located in the upper level on the right (south) side of the house. The front yard mostly consists of beauty bark and a

Attachment A
Application for Search Warrant
Page 3

large rock wall.

**209 10th Avenue South, Kirkland, WA**: This is a two story town house that is beige in color dark brown trim and a flat composition roof that is dark in color with white trim around all of the windows. The town house faces towards 10th Avenue South to the north. A driveway is located on the right (west) side that leads to a double door garage that is dark brown in color. The numbers 209 are displayed in the center above the garage doors in white wood numbering. Directly above the garage doors is a patio that has an aluminum heat lamp and bbq with windows and a sliding door facing to the north and windows facing to the west. To the left of the garage doors, near the center of the town house are two windows that appear to be the kitchen area. To the left of the kitchen windows in the upper left (east) side are another set of windows. The roof area near the center of the town house is lined with a black iron rail. There is a walk way that leads from the driveway to the left (east) side of the town house where the front entrance is located. The front entrance is not visible from the street.

**A Black 2007 GMC Yukon, Washington license 190VNG**, and a Vehicle Identification Number (VIN) of 1GKFK66887J173147.

**A Black 2006 BMW 325CV, Washington license ACE4066**, and a Vehicle Identification Number (VIN) of WBABW33426PX84766.

**A Warehouse Unit at 1621 Central Ave S, #40, Kent, WA** This is a single story warehouse unit that is beige in color with aluminum siding and roof located on the south side of the Plemmons Industrial park. Unit #40 faces to the north and has a dark brown entrance door with a rectangular piece of glass in the center. Above the entrance door there is a glass header with dark brown trim and the numbers 40 are displayed in dark brown paint directly on the glass. There is a mail slot that is gold in color located to the left (east) of the entrance door. Above the mail slot are two vertical shaped glass windows with dark brown trim. All windows located near the entrance have shades that are closed. To the right (west) of the front entrance door is a large freight (garage) door that is also beige in color that has three glass windows that stretch across the bottom half of the door that are covered from the inside in white.

**2512 162nd Drive SE, Snohomish, Washington**: this is a two-story single-family house. The house is cream in color with white trim and cedar and stone accents. There is a large porch and attached two car garage with white garage doors. There is a large, older, wood barn situated behind the house. The house number, 2512, is posted in black

Attachment A
Application for Search Warrant
Page 4

lettering on the front of the house, just to the right of the two-car garage door, adjacent to the exterior light.

**7914 86th Drive NE, Marysville, Washington**: Is a two story single family home which is tan in color with white trim. There is an attached two car garage with a white garage door. To the left of the garage door the numbers "7914" is posted in gold lettering.

**11730 51st Avenue NE, Unit B, Marysville, Washington, and detached garage**: is a cream colored two story duplex with white and brown trim. The duplex has two-2-car garages with white garage doors. The letter "B" is posted under the exterior light adjacent to the north garage. Located to the south of the duplex on the property is also a large detached outbuilding which is tan in color. There are four white garage type doors and one people size door.

## ATTACHMENT B
## ITEMS TO BE SEARCHED FOR AND SEIZED

This warrant authorizes the government to search for the following items:

Evidence and/or fruits of the commission of the following crimes: Distribution and possession with intent to distribute controlled substances in violation of 21, U.S.C. § 841(a)(1); use of a communications facility in furtherance of a felony drug offense in violation of 21, U.S.C., § 843(b); conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21, U.S.C. § 846; interstate and foreign travel to promote, manage, establish, carry on, or facilitate unlawful activity, in violation of 18 U.S.C. § 1952; laundering of monetary instruments in violation of 18 U.S.C. 21 956; Bulk Cash Smuggling into or out of the United States in violation of 31 U.S.C. § 5332; and Importation of Controlled Substances in violation of 21 U.S.C. § 952; Possession of Firearms in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c) including but not limited to the following materials:

1.    Controlled Substances:  including but not limited to marijuana and cocaine.

2.    Drug Paraphernalia:  Items to be used to store and distribute controlled substances, such as plastic bags, cutting agents, scales, measuring equipment, and similar items.

3.    Drug Transaction Records:  Documents such as ledgers, receipts, notes, and similar items relating to the acquisition, transportation, and distribution of controlled substances, however stored, including in digital devices.

4.    Customer and Supplier Information:  Items identifying drug customers and drug suppliers, such as, telephone records, personal address books, correspondence, diaries, calendars, notes with phone numbers and names, "pay/owe sheets" with drug amounts and prices, and similar items, however stored, including in digital devices.

5.    Cash and Financial Records:  Currency and financial records that show income from drug trafficking, including bank records, safe deposit box records and keys, credit card records, bills, receipts, tax returns, vehicle documents, and similar items; and other records that show income and expenditures, net worth including receipts for personal property, negotiable instruments, bank drafts, cashiers checks, and similar items.

Attachment B
Application for Search Warrant
Page 1

6.    Photographs: Photographs, video tapes, digital cameras, and similar items depicting friends and relatives of the property occupants, or suspected buyers or sellers of controlled substances, controlled substances, and assets derived from the distribution of controlled substances.

7.    Property Records: Deeds, contracts, escrow documents, mortgage documents, rental documents, and other evidence relating to the purchase, ownership, rental, or control of the premises, and similar records of other property owned or rented.

8.    Firearms: Magazines, ammunition, and body armor.

9.    Codes: Evidence of codes used in the distribution of controlled substances, including but not limited to passwords, code books, cypher or decryption keys, and similar information.

10.    Cell Phones: Cellular telephones and other communications devices including Blackberries may be seized, and searched only for the following items:
  i.    Assigned number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);
  ii.    Stored list of recent received calls;
  iii.    Stored list of recent sent calls;
  iv.    Stored contact information; and
  v.    Stored Photographs of Narcotics, Suspected Criminal Activity and/or co-conspirators; and
  vi.    Stored text messages.
Cellular telephones and other communications devices may not be searched without further judicial authorization, in the absence of any other legal basis justifying a search.

In addition, there is probable cause to believe that said devices are instrumentalities of the offense, and may be seized and searched on that basis.

11.    Computers. This warrant seeks permission to seize, but not search, computers. Any search of said devices will be subject to a future warrant.

Attachment B
Application for Search Warrant
Page 2

**ATTACHMENT C**
**THE SEARCH IS IN VIOLATION OF:**

This warrant is based on the commission of the following crimes:

Distribution and possession with intent to distribute controlled substances in violation of 21, U.S.C. § 841(a)(1); use of a communications facility in furtherance of a felony drug offense in violation of 21, U.S.C., § 843(b); conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21, U.S.C. § 846; interstate and foreign travel to promote, manage, establish, carry on, or facilitate unlawful activity, in violation of 18 U.S.C. § 1952; laundering of monetary instruments in violation of 18 U.S.C. 21 956; Bulk Cash Smuggling into or out of the United States in violation of 31 U.S.C. § 5332; and Importation of Controlled Substances in violation of 21 U.S.C. § 952; Possession of Firearms in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c).

Attachment C
Application for Search Warrant

# AFFIDAVIT

County of King                    )
                                  )
State of Washington               )

I, **Bryan P. Winger**, a Special Agent with Homeland Security Investigations, Seattle, Washington, having been duly sworn, states as follows:

## INTRODUCTION

1.      Over approximately the last year, federal law enforcement has been conducting an investigation into the Jacob STUART Drug Trafficking Organization (DTO). The investigation has included, among other techniques, court-authorized Title III wiretaps. The investigation shows that the STUART DTO is moving very large quantities of Canadian marijuana, via private aircraft, from the Western District of Washington to various other parts of the United States. More recently, the investigation shows that the DTO is also using private aircraft to bring large quantities of cocaine from the Los Angeles, California area to this District, likely for transshipment into Canada. This application seeks permission to search residence, vehicles, and stash locations associated with members, associates and customers of the DTO.

## A.   AFFIANT'S EXPERIENCE AND TRAINING

2.      I am employed as a Special Agent with the Department of Homeland Security (DHS), Homeland Security Investigations (HSI) and have been so employed since April of 1998. I am currently assigned to the Narcotics and Bulk Currency Smuggling Investigations Group at the Special Agent in Charge (SAC) Seattle office. My training includes eighteen weeks in the Criminal Investigator Training Program (CITP) and Customs Basic Enforcement School (CBES) at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. In addition to the training received at FLETC, I have received hundreds of hours of specialized training in drug identification, money laundering methods, cases involving criminal conspiracy and organized crime, gangs, undercover techniques, electronic surveillance, airport interdiction, vessel interdiction, officer safety, survival, and tactical techniques. During my employment with

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 1

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  HSI, I have participated in hundreds of narcotics and currency investigations involving

2  search warrants. These warrants authorized the search of locations ranging from the

3  residences of drug traffickers and their co-conspirators or associates, to houses and

4  apartments, as well as safe deposit boxes, packages, outbuildings, barns, garages,

5  vehicles, vessels, businesses, and rented storage lockers. I have also participated in

6  several court authorized Title III investigations, wherein the court has authorized the

7  interception of telephone conversations.

8      3.      In my capacity as a Special Agent, I have conducted investigations of the

9  Controlled Substance Act, that is, Title 21, United States Code, Section 841, et seq., and

10  related offenses. My training and experience have involved, among other things: (1) the

11  debriefing of defendants, witnesses, and informants, as well as others who have

12  knowledge of the distribution and transportation of controlled substances and of the

13  laundering and concealment of proceeds of drug trafficking; (2) surveillance; (3) analysis

14  of documentary and physical evidence; and (4) the "undercover" purchases of controlled

15  substances. In addition, I have participated in federal search warrants and wiretap

16  investigations. I have supplied information to support affidavits and/or sworn to

17  affidavits for search and seizure warrants in these investigations. These search and

18  seizure warrants have authorized the search of locations ranging from the residences and

19  vehicles of drug traffickers and their co conspirators, to houses and structures used for the

20  manufacture of controlled substances. Items searched for and recovered in these

21  locations have included narcotics, US currency, firearms, telephone and address books,

22  cellular telephones, pagers, handwritten drug ledgers/pay owe sheets, and handwritten

23  notes regarding names and telephone numbers of criminal associates.

24      4.      As a result of this training and experience, I am familiar with the methods

25  used by narcotics traffickers to smuggle, transport, conceal and distribute narcotics and

26  currency in the Western District of Washington, and elsewhere. The information

27  contained in this affidavit is based upon my own participation in this investigation, my

28  conversations with other law enforcement officers involved in this investigation, and

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 2

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    reading the reports written by other law enforcement officers involved in this

2    investigation.

3    **B.    PURPOSE OF AFFIDAVIT.**

4         5.    This Affidavit is submitted in support of a request to search the residences,

5    vehicles, and businesses described further below.  As set forth below, there is probable

6    cause to believe that each location contains evidence of one or more of the following

7    violations of federal law:

8              a.    Conspiracy to distribute marijuana and/or cocaine, in violation of

9    Title 21, United States Code, Sections 841 and 846;

10             b.    Distribution of marijuana and/or cocaine, in violation of Title 21,

11   United States Code, Sections 841(a)(1), 841(b)(1)(C), and Title 18, United States Code

12   Section 2;

13             c.    Use of a communications facility in furtherance of a felony drug

14   offense in violation of 21, U.S.C., § 843(b);

15             d.    Interstate and foreign travel to promote, manage, establish, carry on,

16   or facilitate unlawful activity, in violation of 18 U.S.C. § 1952;

17             e.    Laundering of monetary instruments in violation of 18 U.S.C. §

18   1956;

19             f.    Bulk Cash Smuggling into or out of the United States in violation of

20   31 U.S.C. § 5332; and

21             g.    Importation of Controlled Substances in violation of 21 U.S.C. §

22   952.

23        6.    The items to be seized are more particularly described in Attachment "B"

24   hereto, which is incorporated by this reference.

25   **C.    THE LOCATIONS TO BE SEARCHED.**

26        7.    Permission is sought to search the following locations, each of which is

27   described with particularity in Attachment "A" hereto, incorporated by this reference:

28

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 3

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1          a.      **12614 NE 140th St., Kirkland, Washington** (hereafter, the "Stuart

2    Residence"). This is the residence of Jacob STUART, the head of the Stuart Drug

3    Trafficking Organization (DTO).

4          b.      **Black GMC 2007 Yukon, Washington license AAD7449,**

5    (hereafter, "Stuart's Yukon") bearing Vehicle Identification Number (VIN)

6    1GKFK63897J270569, registered to Brooke A. Stuart (STUART's spouse) at the Stuart

7    Residence. This is a vehicle belonging to, and used by, STUART.

8          c.      **White 2006 Lexus, GS44D, Washington license AAN5624,**

9    bearing VIN JTHBN96S065001716, again registered to Brooke Stuart, and registered at

10   the Stuart residence. Again, this is a vehicle belonging to and used by STUART.

11         d.      **5960 Terrace View Lane SE, Apt. H-206, Auburn, Washington,**

12   **and detached Garage #62** (hereafter, "Lamar's Apartment"). This is the apartment

13   residence of Richard LAMAR. Based on wire intercepts and surveillance, LAMAR is

14   STUART's primary "runner" and right-hand man.

15         e.      **White Ford 2006 F-150 Truck, Missouri license 2CE972,**

16   (hereafter, Lamar's truck) bearing VIN 1FTRF14W16KA833302, registered to Richard

17   LAMAR at 7253 Watson Road, # 123, St. Louis, MO.

18         f.      **Black 2002 Volkwagen Golf, Washington license 596ZAT**, VIN

19   9BWDE61024007500, (hereafter, "Lamar's VW") registered to LAMAR at 13007 213th

20   Ave. Ct. E, Bonney Lake, WA.

21         g.      **4003 SW 98th Street, Seattle, Washington** (hereafter, "Prohaska's

22   residence"). This is the residence of Phoebe PROHASKA, a runner/courier for the DTO.

23         h.      **White 2006 Dodge Caravan, Washington license B59536L,** VIN

24   1D4GP23R06B539587 (hereafter, PROHASKA's van). This vehicle is used by and

25   registered to PROHASKA at 8856 16th Ave. SW, Seattle, WA.

26         i.      **8805 35th Ave. SW, Seattle, WA.** ("Prohaska's Stash House") This

27   is a suspected stash location for controlled substances used by the DTO, specifically

28   associated with PROHASKA and an unidentified male with a limp.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 4

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1          j.     **Burgundy 2007 Chevy Tahoe, Washington license ACN5641,**

2  with a VIN of 1GNFK13007R319043, registered to Luci R. Lucarrelli, at 8408 36th Ave.

3  SW, Seattle, WA.  This vehicle is driven by an unknown male with a pronounced limp

4  ("FNU LNU West Seattle") who was first seen parking at 9402 36th Ave SW in West

5  Seattle.  This same individual has also been observed by surveillance while driving

6  PROHASKA's van.  Most recently, this vehicle has been observed at PROHASKA's

7  stash house in West Seattle on multiple occasions, while FNU LNU West Seattle moved

8  items to and from the vehicle and the garage.  The registered owner, Luci R. Lucarrelli is

9  believed to be the girlfriend of FNU LNU West Seattle, and the sister of DTO member

10  Trey OLSON's ex-wife.  Lucarrelli also drives a White Lexus with Washington license

11  339XGA that was observed on multiple occasions early on in the case (August to

12  September/October) parked at 9402 36th Ave SW in West Seattle.  This vehicle has not

13  been at that residence in quite some time but the Burgundy Tahoe used to have a Oregon

14  plate on it, registered to an older man to an address in Oregon.  More recently, the vehicle

15  was re-plated to Washington and registered to LUCARRELLI

16          k.     **6300 39th Ave. South, Seattle, WA** (hereafter, Washington's

17  residence).  This is the residence of John WASHINGTON, a member of the DTO.  This is

18  the residence of John WASHINGTON, who has been repeatedly intercepted speaking

19  with STUART over the Title III about drug trafficking, and seen engaged in activity

20  consistent with drug deliveries with LAMAR at this address.

21          l.     **13327 Puget Sound Blvd., Edmonds, WA** (hereafter, Artiach's

22  residence).  This is the residence of Isaac ARTIACH, a "catcher" of marijuana for the

23  DTO.

24          m.     **209 10th Ave. South, Kirkland, WA** (hereafter, Wolverton's

25  residence).  This is the residence of Robert James WOLVERTON, a member of the DTO,

26  who has been repeatedly intercepted over the T-III discussing drug transactions and drug

27  debts with STUART.

28          n.     **Black 2007 GMC Yukon, Washington license 190VNG,**

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 5

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  (hereafter, "Wolverton's Yukon") VIN 1GKFK66887J173147, registered to

2  WOLVERTON at his residence.

3          o.    **Black 2006 BMW 325CV, Washington license ACE4066,**

4  (hereafter, "Olson's BMW"), VIN WBABW33426PX84766, registered to Trey OLSON,

5  at 5645 California Ave. SW, No. B, Seattle, WA.

6          p.    **Warehouse Unit # 40, at 1621 Central Ave. S., Kent, WA** (Stash

7  Warehouse).  This is a suspected stash location for controlled substances used by the

8  DTO.

9          q.    **2512 162nd Drive SE, Snohomish, Washington** (the marijuana

10  grow house).  This is a suspected marijuana grow and/or stash house that is supplying

11  members of the STUART DTO.

12          r.    **7914 86th DR NE, Marysville, WA** (Bennett's Residence).  This is

13  the residence of Joshua BENNETT.

14          s.    **11730 51st Ave NE, Unit B, Marysville, WA** (Worster's

15  Residence) and unattached garage.  This is the residence of Brent WORSTER, and also a

16  suspected stash locations for controlled substances.

17  **D.    COMMON CHARACTERISTICS OF DRUG TRAFFICKERS AND DTOs.**

18      8.    As a result of my training and experience, and based on my consultation

19  with other agents and law enforcement officers, I have an understanding of the manner in

20  which narcotics are distributed and the various roles played by individuals and groups in

21  their distribution.  I have encountered and have become familiar with various tools,

22  methods, trends, paraphernalia and related articles utilized by various traffickers in their

23  efforts to import, conceal and distribute controlled substances. I am also familiar with the

24  manner in which drug traffickers use telephones, often cellular telephones, to conduct

25  their unlawful operations.  I am also familiar with the manner in which drug traffickers

26  will use weapons to protect their drug activities and further its goals.

27      9.    Based upon my training, experience, and conversations with other

28  experienced officers and agents, I know that:

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 6

a. It is common for drug dealers to use cellular phones subscribed to in a name other than their own. It is also common for drug dealers to use "pre-paid" cellular phones for which no real subscriber information is available. Indeed, as set forth below, members of this DTO have been repeatedly intercepted using Verizon pre-paid cell phones.

b. During the execution of search warrants at the residences of drug dealers, it is common to find papers, letters, billings, documents, and other writings, which show ownership, dominion, and control of vehicles, residences, and/or storage units.

c. It is common for drug dealers to secrete contraband, proceeds of drug sales, and records of drug transactions in secure locations within their vehicles, residences, and/or storage units for their ready access and to conceal these items from law enforcement authorities.

d. Narcotics traffickers often maintain books, records, receipts, notes, ledgers, airline tickets, money orders, and other papers relating to the transportation, ordering, sale and distribution of controlled substances.

e. Narcotics traffickers sometimes "front," that is, provide on consignment, controlled substances to their clients. These books, records, receipts, notes, ledgers, commonly known as "pay and owe sheets," are maintained where the traffickers have ready access to them. Increasingly, sophisticated DTO's maintain these records electronically, either on computers or on cell phones or so-called "smart phones."

f. Traffickers of controlled substances commonly maintain addresses or telephone numbers in books or papers which reflect names, addresses, and/or telephone numbers of their clients and associates in the trafficking organization. Again, sophisticated DTO's maintain these records electronically, either on computers or on cell phones or so-called "smart phones."

g. Persons involved in drug trafficking conceal in their residences caches of drugs, large amounts of currency, financial instruments, precious metals,

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 7

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  jewelry, and other items of value and/or proceeds of drug transactions as well as evidence

2  of financial transactions relating to obtaining, transferring, secreting, or the spending of

3  large sums of money made from engaging in narcotics trafficking activities.

4  　　　　h.　　Drug traffickers amass large proceeds from the sale of drugs and that

5  they attempt to legitimize these profits.  To accomplish these goals, drug traffickers

6  utilize domestic banks and their attendant services, securities, cashier's checks, safe

7  deposit boxes, money drafts, letter of credit, brokerage houses, real estate, shell

8  operations, and business fronts.  Persons involved in drug trafficking and or money

9  laundering keep papers relating to these activities for future reference.

10  　　　　i.　　Drug traffickers very often place assets in corporate entities in order

11  to avoid detection of these assets by government agencies.

12  　　　　j.　　Since the Government's efforts at seizing and forfeiting drug related

13  assets have been widely publicized in the news media and by word of mouth, I know that

14  drug traffickers often place assets in names other than their own to avoid detection of

15  these assets by government agencies.  Even though these assets are in other person's

16  names, the drug dealers actually own and continue to use these assets and exercise

17  dominion and control over them.

18  　　　　k.　　My experience shows, and Court decisions have recognized, that

19  unexplained wealth is probative evidence of crimes motivated by greed, in particular,

20  trafficking in controlled substances.

21  　　　　l.　　Evidence relating to ownership and interest in real property is often

22  located at the residences, businesses and banks of traffickers.

23  　　　　m.　　Drug traffickers take, or cause to be taken, photographs of

24  themselves, their associates, their property, and their product.  These traffickers usually

25  maintain these photographs in their possession.

26  　　　　n.　　Narcotic traffickers who distribute controlled substances must

27  maintain on hand amounts of U.S. currency in order to maintain and finance their on

28  going narcotics business.  Traffickers commonly deal in currency because of its

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 8

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  untraceable nature, and also convert their illicit currency into currency equivalents such as

2  cashier's checks and money orders.

3        o.    Traffickers utilize cell phones, smart phones, Blackberry devices,

4  text messages and/or email devices for ready access to their clientele for the purpose of

5  maintaining their drug related business, and to store customer and supplier names and

6  contact information.

7        p.    Persons trafficking and using controlled substances commonly sell or

8  use more than one type of controlled substance at any one time.

9        q.    It is common for drug dealers to also be users of their product, and it

10  is common for the drug user to keep paraphernalia, such as syringes, pipes, spoons,

11  containers, straws, razor blades, and other items which are associated with the use of

12  controlled substances as well as paraphernalia associated with the manufacture and sale

13  of controlled substances such as scales, sifters, containers, cutting agents and other

14  packaging materials associated with the manufacturing, processing and distribution of

15  controlled substances in their vehicles,  residences, and/or storage units.

16        r.    Drug traffickers commonly have in their possession, on their person,

17  and at their residences, and/or in their vehicles and storage units, firearms, and other

18  weapons which are used to protect and secure a drug trafficker's property.  Such property

19  may include, but is not limited to, controlled substances, paraphernalia for the use or sale

20  of controlled substances, books, records, jewelry, and U.S. currency.

21        s.    Based on my experience, evidence of drug trafficking, such as the

22  items described above, is likely to be found where the drug dealers reside, in their

23  vehicles, and in their storage units, despite the lack of direct evidence of criminal activity

24  at the residence or the passage of several months since the last reported activity.

25        t.    I am familiar with case law in the Ninth Circuit that holds that

26  evidence of drug trafficking, such as the items described herein, is likely to be found

27  where the drug dealers reside, and a search warrant may be properly issued for a

28  suspected drug dealer's residence (or temporary residence or storage locker) despite the

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 9

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    lack of direct evidence of criminal activity at the residence or the passage of a number of

2    months since the last reported activity.

3         u.    I know that marijuana and cocaine are controlled substances. In my

4    experience and the experience of the law enforcement agents with whom I associate, the

5    illegal distribution of controlled substances is frequently a continuing activity over

6    months and years.

7         v.    Persons involved in the trafficking of controlled substances typically

8    will obtain and distribute drugs on a regular basis, much as a distributor of a legal

9    commodity would purchase stock for sale. Similarly, such drug traffickers will maintain

10   an "inventory," which will fluctuate in size depending upon the demand for and the

11   available supply of the product.

12        w.    It has been my experience that drug traffickers keep records of their

13   illegal activities also for a period of time extending beyond the time during which the

14   trafficker actually possesses/controls illegal controlled substances, in order to maintain

15   contact with criminal associates for future transactions and so that the trafficker can have

16   records of prior transactions for which the trafficker might still be owed money or might

17   owe someone else money.

18        x.    The aforementioned items are often maintained by the drug trafficker

19   in secure locations within the premises under their dominion and control, in their

20   vehicles, storage units, residences, and/or on their person, not only for ready access, but

21   also to prevent them from being stolen by other drug dealers and to conceal them from

22   law enforcement. These items are often concealed on property in/and around the

23   trafficker's residences, in order to conceal the illicit items from law enforcement, should a

24   search by law enforcement at the location occur.

25        y.    Additionally, I know that drug dealers sometimes attempt to insulate

26   themselves from detection by law enforcement by utilizing separate addresses from their

27   actual residence to store illegal narcotics and currency derivative of the narcotics trade.

28

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 10

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    **E.      SOURCES OF INFORMATION.**

2      10.      I have participated in the investigation described herein since August 2010.

3    I have obtained the facts set forth in this affidavit through personal participation in the

4    investigation described below, from the review of consensually recorded calls to date,

5    from oral and written reports of other law enforcement officers, from records, documents

6    and other evidence obtained during this investigation, and from confidential sources and

7    sources of information who are associated with, and knowledgeable about, the subjects of

8    this investigation and their confederates.

9      11.      I have also reviewed a large number of intercepted phone calls, obtained

10   pursuant to court-authorized Title III wiretaps both in this district and in Atlanta, Georgia.

11   I have obtained and read official reports prepared by various law enforcement officers

12   participating in this investigation and in the other related investigations by the DEA, HSI,

13   and the Federal Bureau of Investigation ("FBI").

14     12.      When this affidavit refers to vehicle ownership, either other agents involved

15   in the investigation or I have reviewed the relevant state vehicle records from the

16   Washington State Department of Licensing (DOL), or the equivalent agency in other

17   states.  Similarly, when I refer to identification documents, either other agents involved in

18   the investigation or I have reviewed the relevant driver's license or similar records

19   maintained by DOL or the equivalent agencies in other states.  When I refer to the

20   criminal history of a subject, either other agents involved in the investigation or I have

21   reviewed the available criminal history from state or federal agencies.  When I refer to

22   telephone subscription records, either other agents involved in the investigation or I have

23   reviewed the subscriber records obtained from the telephone company by administrative

24   subpoena or court order, or I have obtained the information from other law enforcement

25   officers familiar with this investigation.  When I refer to telephone toll records, I have

26   received the information from the telephone company pursuant to an administrative

27   subpoena or court authorized pen registers.

28     13.      Since this affidavit is being submitted for the limited purpose of obtaining

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 11

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   search warrants, I have not included every fact known concerning this investigation. I

2   have set forth only the facts that I believe are essential to establish the necessary

3   foundation for an order authorizing search warrants.

4       14.    This investigation is being conducted by the Drug Enforcement

5   Administration (DEA) Seattle Field Division, and Homeland Security Investigations

6   (HSI) Seattle Special Agent in Charge (SAC) Office, Seattle Police Department (SPD),

7   Washington State Patrol (WSP), and King County Sheriff's Office (KCSO).  Some

8   information pertaining to the targets of this information has also been obtained by the

9   Federal Bureau of Investigation (FBI), which has a separate but overlapping investigation

10  into a separate "cell" related to the Jacob STUART Drug Trafficking Organization (DTO)

11  headed by Jason BARBOUR.

## INVESTIGATION AND PROBABLE CAUSE

### A.   BEGINNING OF THE INVESTIGATION.

14      15.    This investigation of the Jacob STUART DTO (hereafter STUART DTO)

15  was initiated by DEA and ICE (now HSI), in Portland, Oregon.  Both agencies were

16  investigating independent marijuana related cases.  Based on their independent

17  investigations, these agents learned that the source of marijuana for these separate

18  investigations was the STUART DTO.  DEA and HSI agents conducted several proffer

19  interviews of members of the DTO.  These interviews started to identify several current

20  members of the DTO, predominately Jacob STUART (hereafter STUART), Jason

21  BARBOUR (hereafter BARBOUR), and Michael MURPHY (hereafter MURPHY).  Due

22  to the fact that there were no more significant investigative ties to Oregon, the

23  investigation was transferred to DEA/HSI Seattle.

24      16.    DEA/HSI Seattle initiated a joint investigation of the STUART DTO in

25  May of 2010.  Based on the investigation, the STUART DTO is believed to be an

26  international and multi-state poly drug (marijuana/cocaine) distribution operation that is

27  responsible for the distribution of approximately 1,000 to 2,000 pounds of marijuana and

28  100 to 200 kilos of cocaine a month.  The marijuana is being smuggled across the

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 12

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    Canadian border by various means, including inside cattle and manure trucks, according

2    to one cooperating informant (CI-1).

3            17.    In summary, information obtained from CIs, and corroborated via wiretap

4    intercepts, surveillance, and other investigative techniques, shows the following:

5            a.    STUART is the head of the DTO, coordinating the shipment of

6    marijuana and, more recently, cocaine, across the United States and likely into and out of

7    Canada. Historically, STUART's partner has been Jason BARBOUR. BARBOUR was

8    and is the subject of a separate DEA investigation in California, a fact known to

9    BARBOUR. As a result, BARBOUR is currently hiding out in the Atlanta, GA area,

10   where he is the subject of a separate FBI investigation and wiretap.

11           b.    The DTO uses aircraft flown by multiple pilots, including Michael

12   MURPHY, David THOMSON, and Brandon PARKER, who all have been observed by

13   surveillance agents picking up suspected loads of marijuana at Thun Field located in

14   Pierce County Washington, which are then flown to various parts of the United States.

15   Two more individuals with pilot's licenses who work with the DTO have been identified,

16   David HULLIGAN and Daniel RASKANSKY.

17           c.    The DTO also uses individuals who act as "catchers" (people who

18   obtain and store the marijuana after it comes into the United States) and as

19   runners/couriers. These individuals include LAMAR, ARTIACH, PROHASKA, and

20   BENNETT.

21           d.    STUART also works with customers, who sometimes help to also

22   identify other potential customers for his drugs. These individuals include

23   WASHINGTON, OLSON, and WOLVERTON.

24           e.    Interviews with cooperating confidential informants (CIs), and

25   subsequent wire intercepts, indicate that the primary source of supply (SOS) of the

26   marijuana to the Jacob STUART DTO is a person who has been identified by their

27   moniker of "RED" and who is a member of the White Rock Chapter (WRC) of the Hell's

28   Angels based in British Columbia, Canada. Based on the investigation to date, I believe

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 13

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   that "RED" is Trevor JONES who has been identified by the Royal Canadian Mounted

2   Police (RCMP) as the twin brother of Randal JONES.  RCMP has also confirmed that

3   Randal JONES is in fact a full patched member of the WRC Hell's Angels. It is believed

4   that Trevor JONES is an associate of this chapter.  Furthermore it was learned that Trevor

5   JONES is a significant trafficker of marijuana into the United States.  We have not

6   intercepted any calls *with* Trevor JONES; however, we have (as detailed below)

7   intercepted calls we believe are *about* JONES, and surveilled meetings between JONES

8   and LAMAR, acting on STUART's behalf.

9   **B.     THE CONFIDENTIAL INFORMANTS.**

10       18.     The investigation proper began with interviews of two separate Confidential

11   Informants, CI-1 and CI-2.  CI-1 and CI-2 both began cooperating for prosecutorial

12   consideration regarding state drug charges.  Those state charges have since been

13   dismissed and both continue to work owing to those dismissals as well as for possible

14   monetary consideration.

15       19.     I believe, as do other agents and officers that have worked with them, that

16   the informants have provided reliable information, which has in large part been

17   corroborated by other investigative techniques.  These other techniques include:

18   surveillance, trash pulls, arrests, interviews, seizures, and Title-III wire intercepts.

19   However, I have not interviewed every agent or detective that has ever possibly

20   encountered the CI, have not reviewed all police reports related to the CI's criminal

21   convictions, and have not examined all aspects of their private lives that might reflect on

22   their credibility, such as employment, civil lawsuits, rental history, and similar

23   information.  The confidential sources are working under DEA's Confidential Source

24   Agreement.  However, facts relevant to a credibility determination for the CIs may exist

25   that investigators have not yet uncovered.

26       20.     In judging the credibility of the CIs it is significant that they have been and

27   will remain in contact with Jacob STUART and other members of the DTO.

28   Investigators have asked the sources to make recorded phone calls and/or have monitored

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 14

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   face-to-face meetings with members of the DTO.  Such operations involve close

2   surveillance, a search of the source before and after, recordings (when possible) and

3   complete debriefing of the source immediately afterward.  It is extremely difficult for a CI

4   to conceal drugs or money, or to fail to follow instructions closely.

5         21.    CI-1 has one felony conviction for Assault 3 (1996), a Municipalities Code

6   Violation arrest which was dismissed (2006), and a separate arrest for Traffic Offenses

7   and Cannabis Trafficking (2010).  The Cannabis Trafficking charges were dismissed after

8   CI-1 agreed to assist law enforcement.  CI-1 has proven to be reliable in this

9   investigation. CI-1 has provided detailed and accurate information in reference to trapped

10   vehicles, aircraft, descriptions of STUART, many of the known "catchers," "runners" and

11   "transporters" some of the customers, as well as STUART's Canadian source of supply.

12   CI-1 has provided many details about the unique manner in which the organization runs

13   the marijuana side of its operation, as detailed in the following paragraphs.  Moreover,

14   CI-1 has followed instructions from law enforcement and has shown a willingness to

15   continue to work with law enforcement even after the state cannabis trafficking charges

16   were dismissed.

17         22.    CI-2 has no criminal convictions, but was also arrested for Cannabis

18   Trafficking in 2010.  Those charges were dismissed after CI-2 agreed to work with law

19   enforcement.  CI-2 has similarly been reliable, and has assisted this investigation with

20   reliable information in reference to vehicles and aircraft used by the DTO, descriptions of

21   STUART and other members of the organization and the organization's operations in

22   regards to marijuana trafficking.  Moreover, CI-2 has followed instruction from law

23   enforcement and has shown willingness to continue to work with law enforcement even

24   after the state cannabis trafficking charges were dismissed.

25         23.    During debriefings in 2010, CI-1 has related detailed information about the

26   Jacob STUART DTO, including the following:

27         a.    Jacob STUART has been involved in drug trafficking for

28   approximately twenty years.  STUART lives well beyond his apparent means and has no

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 15

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   legitimate source of employment. In recent years, STUART began getting Canadian

2   marijuana from a man called "Red," who owns T-Barz in British Columbia. STUART

3   gets the marijuana from Canadian sources which CI-1 believes is smuggled into the

4   United States in truckloads of manure. STUART uses encrypted Blackberry devices to

5   communicate with his Canadian sources.

6           b.    According to CI-1, these loads of marijuana are delivered to

7   so-called "catchers," David TURNER[1] and Isaac ARTIACH. TURNER and ARTIACH

8   store the marijuana until it is picked up by the runners: Beau PAOLILLO, Richard

9   LAMAR, Joshua TIANO. The runners transport the marijuana to customers throughout

10   the United States.

11           c.    STUART also employs a pilot, "O.G.," (identified as Michael

12   MURPHY), who flies the marijuana and cash proceeds to locations in California and the

13   Midwest. STUART was working to extend his operation into New York/New Jersey.

14   STUART works with Jason BARBOUR, who used to be in Los Angeles, CA and who

15   used to collect the money from the marijuana to purchase cocaine, which is transported

16   back into Canada for sale. BARBOUR has, however, been living in Atlanta ever since

17   his house was searched earlier this year by DEA Fresno.

18           d.    According to CI-1, there are several stash locations in Seattle,

19   including a stash house in West Seattle (identified as Trey OLSON's house). CI-1

20   identified John Robert-Leon WASHINGTON as one of the DTO's Seattle-based

21   customers and told investigators that STUART asked WASHINGTON to help get him

22   connected with drug customers in Atlanta, GA.

23      24.    Recently, CI-1 told investigators that STUART had approached him/her

24   about opening an auto body shop with the purpose of laundering drug proceeds, by

25   keeping two sets of books.

26      25.    CI-2 told SAs Wilson and Lassiter that approximately three years ago, a

27

28        [1] To date, investigators have not seen TURNER working for the DTO.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 16

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  member of the STUART DTO named Kenneth ADEE (a subject of the investigations

2  carried out by Portland DEA/HSI), told him to buy this truck from an impound lot in

3  California.  CI-2 met with SA Jack Wilson and Lassiter, and showed them this truck.  The

4  truck has a concealed compartment, accessed under the tailgate.  They asked CI-2 to

5  engage STUART in a conversation regarding this truck.

6      26.    On September 20, 2010, SA Jack Wilson and SA Lassiter witnessed and

7  recorded a phone call between CI-2 and Jacob STUART on 323-493-0568 regarding the

8  sale of a trapped vehicle, in the possession of CI-2, which was purchased for use by the

9  organization.  During that conversation, CI-2 told STUART that he/she had the truck

10  ready to hand over to STUART's "buddy" (Richard LAMAR) and that he/she did not

11  want the truck in his/her name if someone else was going to be using it.  STUART told

12  CI-2 that he was selling the truck to his "buddy" in "SF" (i.e., San Francisco), and told

13  CI-2 to write up a bill of sale and his friend would sign off on it as soon as it was handed

14  over.

15      27.    During this conversation, it was apparent from the conversation and facts of

16  the case that STUART understood why CI-2 would not want the truck to be in his/her

17  name (because it was going to be used by others to smuggle drugs).  In this conversation,

18  STUART also made it clear that the truck belonged to him (STUART) and that it was his

19  to do with what he would, and that STUART knew its purpose (i.e. it was trapped and

20  used for illicit transportation of drugs).

21      28.    During this phone call STUART arranged for CI-2 to meet with Richard

22  LAMAR, a known runner for the DTO, to take possession of the truck.  Later, under

23  close surveillance, CI-2 delivered the truck to LAMAR, who then drove it to Lamar's

24  Apartment in Auburn, WA and parked it.  Surveillance watched as LAMAR got into his

25  white pickup (Lamar's Truck, one of the subject vehicles for this application), which is

26  also believed to be trapped, and backed it into his garage.  LAMAR got out of his truck

27  and went into the garage near the back of the truck.  Moments later, LAMAR his truck

28  out of the garage and parked it elsewhere in the lot.  He then backed the grey trapped

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 17

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  truck that he just picked up from CI-2 into the garage, got out and walked into the garage.

2  LAMAR was only in the garage for a few minutes, then pulled out and parked. Shortly

3  thereafter, LAMAR and his then girlfriend, Cara FULTON, drove the grey truck to San

4  Francisco.

5         29.     With the knowledge that both of these trucks are trapped and that LAMAR

6  has been identified as a transporter for the DTO, I believe that LAMAR unloaded either

7  narcotics or bulk cash drug proceeds from the white truck into garage, then loaded them

8  into the grey truck, which was then delivered to a customer or other member of the DTO

9  in San Francisco.

10         30.     CI-2 says that members of the DTO use the trap compartment to transport

11  marijuana and cash proceeds. CI-2 has provided investigators with the precise location of

12  a stash house in Seattle and general information about stash houses in Detroit and Los

13  Angeles. CI-2 also identified STUART as the head of this trafficking organization as

14  well as the following information:

15         a.     STUART is the head of the organization based out of Seattle.

16  STUART works with "G" or Jason BARBOUR, who used to live in Southern California.

17         b.     CI-2 saw a photograph of Trey OLSON and identified OLSON as

18  another person working for STUART. CI-2 said that he/she and STUART picked up

19  marijuana at OLSON's house in Seattle. OLSON was not at the house that, but CI-2 saw

20  photographs of OLSON all over the house. During a recent de-briefing, CI-2 directed

21  investigators to Trey OLSON's house and pointed to it as surveillance drove by, saying

22  that was the "stash house" previously mentioned.

23         c.     Also, CI-2 recognized OLSON from an encounter that took place in

24  March 2010 in Cleveland, Ohio. On that occasion, CI-2 was instructed to rent a hotel

25  room, where he/she put approximately 40 pounds of marijuana that he/she picked up

26  earlier in another city from MURPHY. BARBOUR and OLSON came to the hotel and

27  instructed him/her to go downstairs and wait in the bar. BARBOUR and OLSON were

28  supposed to be introducing CI-2 to the contact there, but the contact insisted on meeting

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 18

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   with BARBOUR.  When CI-2 returned to the hotel room the marijuana was gone and

2   there was a suitcase with over $400,000 inside, with a note indicating the amount, but

3   CI-2 cannot remember the exact figure.  CI-2 said that he/she left the suitcase in the hotel

4   room, but was told later that Kenneth ADEE picked it up later that day.

5       31.    According to CI-2, STUART provides the DTO transporters with a phone

6   number to contact either MURPHY or the intended customers on in order to conduct a

7   drug transaction.  In most cases, the transporters will discontinue the use of these phones

8   after each transaction or, simply when the phones minutes run out or expire.  The only

9   reason the DTO members can have for doing this is to avoid being associated to the

10  numbers, thus avoiding law enforcement detection.

11      32.    Recently, the investigation has identified another source, CI-3.  On March

12  7, 2011, CI-3 was traffic stopped near Cedar Rapids, Iowa, on I-80, at the direction of

13  Seattle DEA.  CI-3 was previously intercepted on numerous calls with Jacob STUART

14  utilizing TT-3.  Based on those calls, monitoring agents believed that CI-3 was

15  transporting drug proceeds back to the west coast after collecting proceeds and

16  distributing marijuana in various cities that the DTO supplies.

17      33.    During this traffic stop, agents/officers seized a significant amount of U.S.

18  Currency that was contained in several boxes and wrapped in plastic.  The total amount

19  seized was $1,065,346.  CI-3 agreed to cooperate with law enforcement, and he/she was

20  escorted back to Seattle, WA.

21      34.    SA Andrea Lassiter, SA Jack Wilson, and other agents/officers involved

22  with this investigation have de-briefed CI-3.  During this debrief, agents did not (and

23  have not) disclosed the fact that we are intercepting Jacob STUART and already

24  investigating his DTO.

25      35.    CI-3 stated that initially he/she was recruited by Trey OLSON to assist in

26  the delivery of marijuana by vehicle and by plane.  CI-3 was shown a Washington DL

27  photo of Trey OLSON (without identifying information) which he/she positively

28  identified as OLSON.  CI-3 stated that he/she had delivered marijuana to the area of Los

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 19

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  Angeles, CA for OLSON. CI-3 did state on one occasion in 2009 he/she had seen 20

2  kilograms of cocaine at OLSON's residence in West Seattle, WA.

3      36.    CI-3 said during the course of time dealing with OLSON, OLSON referred

4  CI-3 to work for a person whom CI-3 knew as "Shorty" with a first name of "Jacob."

5  CI-3 was shown a Washington DL photo of Jacob STUART which he/she positively

6  identified as the person he/she knew as "Shorty" and Jacob.

7      37.    CI-3 has stated that he/she has been taking direction from STUART for the

8  past two to three years. CI-3 stated that the $1,065,346 seized by law enforcement

9  belonged to STUART and other members of the DTO. CI-3 stated that STUART is the

10  main person who is directing the delivery of marijuana and collection of drug proceeds

11  and referred to him as the boss. CI-3 stated that STUART directs him/her via telephone

12  on marijuana deliveries, including where and to whom. CI-3 stated that STUART would

13  call CI-3 with a phone number and a code to give when dealing with the customer. CI-3

14  stated the he/she has made delivered marijuana to customers named "Harley," "Honey,"

15  "Rome" and "Buzz" as well as other individuals he did not have names for.

16      38.    CI-3 stated that "Slim" would provide him/her with the phones and that

17  they would be programed with "Shorty's" phone number. CI-3 stated on one occasion

18  he/she had purchased a phone to use for business. CI-3 stated that he/she would receive a

19  new phone almost on every trip, but currently he/she has had his/her current number

20  longer then usual.

21      39.    Two phones were recovered during the traffic stop. A review of CI-3's two

22  phones showed the following numbers listed for "Shorty": 253-293-0777 and 206-718-

23  0476. We were intercepting the first number, pursuant to a Title III wiretap authorized by

24  the Honorable Richard A. Jones. Interception ended on April 23, 2011.

25      40.    CI-3 confirmed that STUART is a significant trafficker of marijuana who is

26  probably making millions of dollars. CI-3 also provided information regarding a

27  purchase of property by STUART and his wife, who we know to be Brooke STUART.

28  CI-3 stated that they had placed $100,000 on top of the table and placed under $100,000

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 20

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  | underneath the table.

2      41.    CI-3 knows that STUART is also directing Mike MURPHY to move

3  marijuana and cash about the country as well.  CI-3 was shown a California DL photo of

4  Michael MURPHY.  CI-3 stated that MURPHY is flying marijuana throughout the

5  country on behalf of STUART, delivering marijuana and then collecting the proceeds.

6  CI-3 stated that he/she has predominately delivered the drug proceeds to Michael

7  MURPHY at his hangar located at/near Marysville, CA.  CI-3 stated that MURPHY's

8  wife, who we know to be Pamela MURPHY, is paid to count the drug proceeds.  CI-3

9  stated he/she does not know where or to whom MURPHY delivers the drug proceeds.

10     42.    CI-3 also stated that STUART has a partner who used to live in southern

11 California but fled to Atlanta, GA, due to some type of law enforcement action.  Based on

12 the context, CI-3 is almost certainly speaking of Jason BARBOUR, the subject of the

13 parallel FBI-Atlanta investigation.  Agent Lassiter subsequently showed CI-3 a picture of

14 BARBOUR, which he tentatively identified as STUART's partner.  CI-3 thought the

15 picture looked like the man he knew to be the partner, but thought he was a bit heavier.

16 CI-3 has also been shown a picture of Berry BARBOUR, Jason's father, and

17 unequivocally identified that person as "the partner's papa," whom he met while

18 delivering marijuana in southern California.  CI-3 knows the partner (Barbour) was

19 dealing cocaine and that he/she believes that STUART knew of his partner's dealing of

20 cocaine.  CI-3 believed he/she may have met the partner in Detroit, MI where he/she had

21 delivered marijuana and collected drug proceeds on behalf of STUART.

22     43.    CI-3 provided information of a white male by the AKA of "Slim."  On

23 March 18, 2011, Agent Wilson showed CI-3 a Washington State Driver License

24 photograph of Richard LAMAR with all other identifying information removed.  CI-3

25 confirmed that Richard LAMAR was the person he knows as "Slim," and that CI-3

26 sometimes refers to LAMAR as "Pic" because he/she "picks up the weed from

27 [LAMAR]."

28     44.    On March 16, 2011, during a consensually recorded phone call, STUART

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 21

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  offered to provide CI-3 with funds to make some repairs to an airplane used for

2  transporting marijuana.  On March 17, 2011, under our supervision, CI-3 met with

3  LAMAR, who delivered $10,000 is U.S. currency to the CI.  Agents were able to see

4  LAMAR and identify Lamar's VW, which he was driving when he arrived to deliver the

5  cash.  In addition, shortly before this meeting, through remote surveillance, SA Wilson

6  saw LAMAR arrive at Washington's residence and take something from the recycle bin

7  and put it under his shirt.  I believe that LAMAR likely took money from the bin, which

8  he then gave to CI-3.

9      45.    CI-3 stated that the marijuana is being smuggled into the United States via

10  fishing boats by Canadians.  CI-3 stated that, approximately a year and a half ago,

11  OLSON directed CI-3 to travel to Anacortes, WA, to wait for a fishing boat that had

12  smuggled marijuana.  CI-3 stated he/she had waited two days without meeting any fishing

13  boat.  CI-3 was later told the boat was intercepted by law enforcement.  CI-3 does not

14  know who is supplying the marijuana to the STUART DTO.

15      46.    CI-3 also stated that he/she had recruited Daniel RASKANSKY to fly

16  marijuana with him/her.  CI-3 stated that RASKANSKY made four trips; two with CI-3

17  and two without.  On the latter trips, CI-3 flew via commercial airline and met with

18  RASKANSKY in the destination city.  CI-3 stated one of these trips was to Joliet, IL.

19  CI-3 stated he/she had flown commercially to Chicago, IL, where he/she was picked up

20  by Michael MURPHY in a rental van and both met with RASKANSKY.  RASKANSKY

21  had flown marijuana to this location and it was loaded into MURPHY's rental van.

22  MURPHY and CI-3 then departed with the marijuana.  This event was observed and

23  independently reported by a Source of Information ("SOI") at the Joliet, IL airport.

24      47.    Since the seizure and debrief, CI-3 has been making directed calls to

25  STUART regarding the seizure of the money.  At our instruction, CI-3 has attempted to

26  convince STUART that the money seized by law enforcement was stolen by unknown

27  parties from the aircraft while it was parked.  That ruse has, to date, proven to be

28  successful.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 22

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

C.     **SURVEILLANCE OF AIRCRAFT**.

48.     For example, On July 24, 2010, HSI Seattle received information from Customs & Border Protection (CBP) Air & Marine Operations Center (AMOC) that the pilot of an airplane with tail number N2668M, a 1986 red and white, fixed wing single engine Beech B36TC with serial number EA-453, registered with the FAA to be owned by Michael MURPHY, and known to be operated by Michael MURPHY, activated a flight plan that designated Pierce County Airport, located at 16715 Meridian East, Puyallup, Washington as the first intended destination. SA Lassiter contacted CBP Office of Air & Marine (OAM) in Bellingham, Washington for surveillance assistance. Surveillance was initiated by HSI Seattle as well as CBP OAM.

49.     At approximately 10:18 a.m., surveillance officers observed the above described airplane taxi to the fueling area at the fixed base operator (FBO) located on the airfield. Surveillance officers observed two people get out and begin fueling the airplane. MURPHY was identified as the pilot and, PARKER was later identified as the passenger in the aircraft on the incoming flight. PARKER left the airplane and walked towards the restaurant, which is located near the fueling station, while MURPHY taxied the plane to an isolated area located at the north end of the airfield.

50.     At approximately 10:58 a.m., surveillance officers observed as a Lamar's Truck parked next to the airplane. A white male, who was identified as LAMAR, exited the truck and hugged MURPHY. Surveillance officers then observed as both LAMAR and MURPHY unloaded six or seven large black hockey type duffel bags from the bed of the truck and placed them into the cargo area of the airplane. MURPHY covered the loaded cargo area of the aircraft with a tarpaulin or blanket. After LAMAR was observed leaving the airfield in his truck, PARKER returned to the airplane and took off. Once airborne, PARKER activated a flight plan, indicating that his first intended destination would be Will County Airport located near Chicago, IL.

51.     At approximately 4:30 p.m., AMOC reported that PARKER had diverted his flight to a small town in Wyoming, where he tied down the airplane and stayed the

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 23

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    night.  The following morning, PARKER continued to St. Louis, MO, where he landed

2    and tied down the airplane.  Surveillance was continued on PARKER and the airplane by

3    HSI agents in St. Louis.  PARKER went to a casino, where agents were able to confirm

4    his identity.  PARKER stayed the night in St. Louis and took a commercial flight back to

5    California the following day.

6        52.    MURPHY subsequently traveled on commercial flights to St. Louis, where

7    he rented a van.  Agents observed, (by use of a camera previously installed at the airport),

8    MURPHY drive to the airplane and unload the hockey bags from the plane into the van.

9        53.    Based on the foregoing, investigators believe that LAMAR delivered

10   hockey bags that contained marijuana to PARKER and MURPHY at Pierce County

11   Airport in Puyallup, WA.  This marijuana was then flown to St. Louis, where

12   investigators know the DTO distributes marijuana to along with other cities located in the

13   Midwest and East Coast of the United States.

14       54.    On August 23, 2010, SA Andrea Lassiter received notification from CBP

15   Air and Marine Operations Center (AMOC) that a target aircraft that is utilized by the

16   STUART DTO to transport currency and narcotics filed a flight plan to fly from

17   California to Washington State.  The aircraft was described above as having tail number

18   N2668M.  The first intended destination was Pierce County Airport in Puyallup, WA.

19       55.    At approximately 7:00 p.m., surveillance officers observed the target

20   aircraft land and taxi to a tie down location near the north end of the airfield.

21   Surveillance officers observed a white male, later identified as THOMSON, exit the

22   airplane, tie it down and take a taxi cab to the Holiday Inn Express located in Puyallup,

23   WA.

24       56.    On August 24, 2010, surveillance officers initiated surveillance at the

25   Pierce County Airport and at the Holiday Inn Express.  At approximately 11:21 a.m.,

26   surveillance officers observed as THOMSON arrived at the airport in a taxi.  At

27   approximately 11:51 a.m., THOMSON walked to the airplane and began pre flight

28   checks.  At approximately 1:12 p.m., LAMAR arrived at the airport in **Lamar's Truck**.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 24

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    LAMAR and THOMSON unloaded hockey type duffel bags from the back of the truck

2    and placed them into the aircraft.  Surveillance officers observed ten bags in all loaded

3    into the airplane.  LAMAR later departed the airport in his truck and THOMSON

4    departed in the airplane.

5         57.    Investigators believe that in the incident described above, LAMAR

6    transferred ten hockey bags filled with marijuana to THOMSON, who later flew it to the

7    Midwest to be distributed to the customers of the STUART DTO.

8         58.    On September 5, 2010, AMOC reported that an airplane with tail number,

9    N2668M, was flying to Pierce County Airport in Puyallup, WA.  Surveillance was

10   initiated at the airport and at **LAMAR's apartment**.  At approximately 11:00 a.m.,

11   surveillance officers observed **LAMAR's truck** backed partially into LAMAR's garage,

12   unit #62.  Surveillance officers observed LAMAR at the back of his truck unloading tires

13   from the bed of the truck.  LAMAR then loaded at least three heavy bags, two were black

14   and one was tan, into the back of his truck.  Surveillance officers maintained surveillance

15   as LAMAR drove away after the bags were loaded.

16        59.    At approximately 11:26 a.m., LAMAR arrived in his truck at Pierce County

17   Airport, where eventually he met with THOMSON.  At approximately 12:29 p.m.,

18   surveillance officers observed LAMAR park his truck to the rear and to the east of the

19   airplane.  Due to the positioning of the truck, surveillance officers were only able to

20   observe the legs of LAMAR and THOMSON as they walked back and forth between the

21   truck and the plane.  From what the officers could see, however, it appeared that LAMAR

22   and THOMPSON were unloading items from the truck and then loading them into the

23   airplane.  Later, both LAMAR and THOMSON departed the airport in their respective

24   conveyances.  AMOC established the airplane on radar as it took off from the airfield.

25        60.    Later this same day, HSI Sacramento agents conducted surveillance at the

26   Yuba City Airport, Yuba City, California.  Surveillance officers observed the aircraft with

27   tail number N2668M, land at the airport.  This is the home airport where the pilots hangar

28   the airplane.  Investigators believe that in the incident described above, THOMSON again

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 25

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  picked up marijuana from LAMAR then flew it back to Yuba City, California.

2          61.     On November 28, 2010 AMOC reported that the pilot (THOMSON) of an

3  airplane with tail number N2668M filed a flight destined for Pierce County Airport in

4  Puyallup, WA.  Surveillance officers initiated surveillance at **LAMAR's apartment** in

5  Auburn, Washington and at the airport.

6          62.     During the surveillance at **LAMAR's apartment**, surveillance officers

7  observed LAMAR load at least six hockey style duffle bags into **Lamar's Truck**.

8  LAMAR then drove the truck to the Pierce County Airport and met with THOMSON,

9  who had just landed at the airfield.  Surveillance officers then observed as THOMSON

10  and LAMAR retrieved ten hockey bags from the truck and placed them into the airplane.

11  Shortly thereafter, LAMAR left the airfield in his truck and THOMSON entered the

12  airplane.  AMOC picked the plane up on radar as it took off from the runway.  AMOC

13  followed the radar track for the plane, which returned to Yuba City Airport in Yuba City,

14  CA.

15  **D.     INTERCEPTED CALLS.**

16          63.     On or about January 7, 2010, the Honorable Richard A. Jones, U.S. District

17  Court Judge of this District, signed an order authorizing the wire intercept of two target

18  telephones, one being used by MICHAEL MURPHY, the other being used by JACOB

19  STUART.  Both phones were also the subjects of numerous prior pen trap orders from

20  this Court.  Those wiretaps were conducted for a period of thirty days.  The wiretap on the

21  phone used by STUART was renewed by Judge Jones on February 18, 2011, and a new

22  line (also used by STUART) was added.[2]  Both of those wiretaps were renewed again by

23  Judge Jones in an order dated March 23, 2011.  In short, we have intercepted

24  approximately 90 days of calls by STUART to and from other members of the DTO.

25          64.     The following is a summary of selected phone calls that establish that

26  _____

27          [2] We discontinued interception of MURPHY's phone, because it was not used

28  much, and almost exclusively to contact STUART.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 26

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1 STUART is, in fact, managing a multi-state DTO.

2       65.     January 9, 2011, Session No. 53. This call was between Stuart and an
3 Unknown Male, using phone number 425-418-4139 (hereafter, "UM4139"), tentatively
4 identified as Beau PAOLILLO. PAOLILLO is believed to be a runner for the DTO.
5 During the call, UM4139 spoke with STUART about using different phone lines and
6 coded information. In particular, UM4139 gives STUART a code, "ABLLKCHSAR."
7 Before UM4139 states this code, he tells STUART that he is not using a new phone, and
8 seems to pause and hesitate as if reluctant to give information over his older phone. After
9 UM4139 states the code, STUART asks UM4139, "Should I call you on a different line
10 than I am using?," and UM4139 responds affirmatively. Based upon this exchange, I
11 believe that this unknown person was relaying coded drug trafficking related information
12 to STUART.

13       66.     Group Supervisor Harkonen of HSI was able to decode this phrase by
14 unscrambling the letters, and determined it actually referred to the word BLACKHORSE.
15 An analysis of this code resulted in the identification of a phone number 312-254-6938.
16 This phone number is listed in the tolls of STUART's new phone number of 253-293-
17 0777 (TT-3). Specifically, session No. 53 was intercepted at approximately 12:26 p.m.
18 STUART made contact with 312-254-6938 from one of STUART'S known phone
19 numbers, at approximately 12:30 p.m. that same day - just four minutes after receiving the
20 coded phone number. On that basis, I believe that STUART and UM4139 (probably
21 PAOLILLO) continued to discuss drug business on those two phones after ending the
22 intercepted call.

23       67.     On January 10, 2011 at approximately 8:02 a.m. (Session Number 63),
24 Jacob STUART, using Telephone 253-350-6785, placed an outgoing call to Michael
25 MURPHY, who is using 323-627-4784. During this call, STUART asks MURPHY if
26 MURPHY has a way to store anything in "Windy's" [phonetic pronunciation] . Based on the
27 investigation to date, I believe that "Windy" may be code for Chicago (the "Windy City"), a
28 known distribution node for the DTO.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 27

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

68.    MURPHY and STUART go on to discuss "Harley", who is, according to a CI in this case, a "catcher" for the DTO. According to the CI, a catcher is someone that stores the loads of marijuana and then distributes portions of it out to the transporters for the DTO.

69.    STUART tells MURPHY they may have to locate "Harley" by calling his sister. MURPHY mentions that they've had to do that before and further says that "[Harley has] got so many little devices, he loses one or it, that's, you know, cause I've left messages and then a month later he'll call me back and say, 'I finally found it, I apologize' that kind of stuff, you know." Based on the investigation to date, and my training and experience, I believe this may be a reference to "Harley" having multiple telephones.

70.    Then MURPHY, getting back to the question of storage in 'Windy's," tells STUART, "You know, there's actually, the only thing that he could or should do is like what I do sometimes, I rent a van, a little family storage van, you know, and just put it in there, then sometimes I gotta come back. You know what I mean?" STUART says, "Yeah." MURPHY states, "I've done that more than once." During the course of this investigation, surveillance officers in multiple cities have seen MURPHY unload hockey-type bags of suspected marijuana into rented minivans. In late August and early September, MURPHY left a load of hockey bags in the back of a minivan, parked in the hotel parking lot in St Louis while MURPHY returned to California. HSI SA Todd Ostrom looked into the window and could see that the load of bags was covered with a blanket or tarp, but one corner was flipped over. SA Ostrom could see that there were bags piled up under the covering.

71.    Based upon this information, I believe during this conversation STUART is asking MURPHY where another male member of the DTO can store marijuana in 'Windy's', and MURPHY is advising that this unidentified person should rent a van and store the marijuana in it until they can locate 'Harley' to drop off the drugs. Furthermore, this discussion illustrates the fact that the members of the DTO are using multiple communication devices and that, on occasion, they lose track of them. MURPHY is also confirming what surveillance has shown so far, that he prefers to use rented family style vans to transport and, in fact, store the drugs for the DTO.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    72.    "Harley" has been identified as Frank J. LOZANO.  LOZANO is believed the

2  be a catcher for the STUART DTO.  During a recent debrief, CI-1 and CI-2 both confirmed

3  that they have both made deliveries to "Harley" in Chicago, IL.  CI-1 told me that he/she

4  believes "Harley" is friends with Jason BARBOUR's father, Berry BARBOUR.  CI-1 believes

5  that "Harley" may also be working for the DTO in Los Angeles, CA.  CI-1 was shown a driver

6  license photograph of LOZANO, with all other identifying information removed, and CI-1

7  confirmed that the man in the photograph is the same person he/she knows as "Harley."  CI-3

8  has also told agents that he has met with a "Harley," but we have not yet shown him a photo

9  of this individual.[3]

10    73.    CI-3's information about "Harley" has been independently corroborated by

11  surveillance observations.  On March 4, 2011, agents watched LOZANO meet with CI-3 in

12  the Chicago area inside a vehicle registered to LOZANO.  Surveillance observed HULLIGAN

13  exit from the vehicle carrying a small brown package.

14    74.    On January 15, 2011, Robert James WOLVERTON, called STUART's

15  phone, TT-1, using phone number 425-327-9776.  During this call (TT-1, Session No.

16  137), WOLVERTON tells STUART that another man apparently has payment for

17  STUART.  WOLVERTON says, "He has checks for the eighty-two, he's all, like, ready to

18  go, so we need to figure out where he's giving everything.  He wants to do it as quickly as

19  possible."  STUART and WOLVERTON continue to discuss an unidentified apparent

20  customer saying that he wants the "exotics."  WOLVERTON asks STUART if he wants to

21  coordinate the pick-up and STUART tells WOLVERTON he will.

22    75.    Based on this initial call, I believe that the WOLVERTON is a facilitator or

23  middle-man for the STUART DTO.  It appears that he is telling STUART that one of the

24  customers has "checks" (payment) for the "eighty-two," which I believe is referring to

25  eighty-two pounds of marijuana.

26  _____

27    [3] Again, CI-3 does not know that we are using a Title-III to intercept STUART,
   and we have endeavored to keep that information from him.  Too great a display of
28  apparent clairvoyance by law enforcement might serve to alert CI-3 to the possible
   existence of the wire.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 29

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

76.     On January 16, 2011, Session No. 147, Trey OLSON, using telephone number 206-518-2789, tells STUART that he has returned to Washington and that he has some orders for him.  He tells STUART that he is in Southern Washington at a Best Western hotel.  The following day, during Session No. 166, STUART calls OLSON asking if they can meet up.  OLSON reminds STUART that he is out of town and tells him they will meet on Tuesday.  I have confirmed that OLSON did stay at a Best Western located in Washougal, WA.  This city is located in southern Washington just across the border from Portland, OR.  When OLSON refers to "orders," I believe this to be for orders for marijuana.

77.     On January 18, 2011 Session No. 173, John WASHINGTON, using telephone number 206-473-0727, tells STUART that he has "half of the check" (meaning money).  STUART later tells WASHINGTON that he will have "SLIM" (LAMAR) en route and maybe get him on his way "outta here" (meaning STUART'S residence).

78.     In response to this call, surveillance officers arrived at **Washington's Residence**, 6300 39th Ave S, Seattle, WA.  At approximately 8:59 p.m., S/A Tom Phillips observed **Lamar's Truck**, back into the driveway at this residence.  LAMAR got out of the truck.  A short period of time later, LAMAR retrieved a box from the bed of the truck and carried it into the garage.

79.     At approximately 9:33 p.m., S/A Tom Phillips observed LAMAR enter his truck and then depart.  Surveillance followed the vehicle until it reached I-405 northbound.

80.     At approximately 10:04 p.m., HSI G/S Anne Harkonen was maintaining surveillance of **Stuart's Residence** in Kirkland.  GS Harkonen observed the **Lamar's Truck** drive by Stuart's residence, and then conduct a U turn where he parked directly in front of the residence.

81.     Based on the intercepted calls, it is believed that WASHINGTON had obtained a portion of money owed to STUART from an unknown customer as the money was referred to as "half of the check."  STUART said he would send "SLIM" over; we know "SLIM" is an alias for LAMAR, which was further corroborated when LAMAR

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 30

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  arrived at **Washington's Residence**. I believe that LAMAR did deliver some marijuana

2  when he carried in the box into the garage. I also believe that LAMAR did collect the

3  cash and transport it to STUART's residence.

4       82.    On February 18, 2011, The Honorable Richard A. Jones authorized the

5  continued interception of one of the phones utilized by STUART (TT-1, above), and also

6  authorized agents to begin intercepting a second phone used by STUART (TT-3).

7  Interception began shortly thereafter.

8       83.    On February 19, 2011, STUART was intercepted speaking with LAMAR

9  (TT-3 Session 39). During the call, the two men discuss having boxes of an unidentified

10  product, which based on the context, the investigation to date, and my training and

11  experience I believe to be controlled substances, likely marijuana. They discuss some of

12  the product being "the blacks," some "the blues" and some "yellow," and how some were

13  mislabeled. Based on the context, these terms are referring to different qualities or grades

14  of marijuana, with some being more desirable/valuable than others.

15       84.    Later that day, STUART talks with HULLIGAN, (TT-3 Session 46) who is

16  believed to be a pilot/courier for the DTO, and they discuss the same general topic.

17  STUART tells HULLIGAN that he gave the "black and blue ones to Suede" when he was

18  supposed to give him "yellows." The two discuss fixing the mistake during this and other

19  later calls. Based on the context, HULLIGAN had mis-delivered a controlled substance to

20  one of their customers, "Suede."

21       85.    Also on February 19, 2011, we intercepted a series of calls between

22  STUART and LAMAR (TT-3, Sessions 68, 74, 77, 79, 80) during which STUART is

23  directing LAMAR on where to meet with another individual referred to as "Red" at a

24  hotel. As referenced above, "Red" is a known moniker for Hells Angel associate Trevor

25  JONES, a known Canadian marijuana supplier.

26       86.    During Session #68, STUART speaks Richard LAMAR, who is using phone

27  number 253-293-4947. LAMAR tells STUART, "I just landed. Yeah." STUART

28  responds, "Ok, if you'll go over to the Aria Hotel." During this series of calls, it appears

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 31

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  that STUART is consulting something to provide directions to LAMAR to meet with

2  JONES, and that there was some confusion as to what room number JONES was stying in.

3  From the context, and based on information provided by a Confidential Source, I believe

4  that STUART is reading the directions off of a Blackberry device.  That conclusion is

5  bolstered by the fact that at one point, (during Session 79), STUART says "just try to find

6  it [JONES' room] 'cause I don't wanna fuckin,' I mean, I don't talk to him on the phone

7  so it's like a pain in the ass."

8          87.     Moments later, in Session #80, STUART tells LAMAR to use the code word

9  "SLICK" (which is STUART's code name), and not to give the code to anyone until he

10  confirmed his code name, "RED."  STUART says, "Hey Buddy. He said, he just said to

11  make sure, you know, use a code word, "Slick," but he said don't give it to anyone until

12  they tell you their name's "Red," too, but he's in his room now, so."

13         88.     Finally, in Session #83, LAMAR tells STUART, "Hey, I just met him."

14  STUART says, "Okay, cool." LAMAR continues, "Alright, it's all done." STUART says,

15  "Alright player." LAMAR says, "And, uh, he said, 'Hi.' He had nothing but good things to

16  say about you." STUART says, "That's good." LAMAR continues, "Yeah, he says you're

17  his best guy-which is good." STUART says, "YEAH, Yeah. Yeah. So that's good." And

18  the conversation ends shortly thereafter.

19         89.     Records checks show that LAMAR did fly from Seattle to Las Vegas, NV

20  on that date. "Red" is the nickname or codename for Trevor JONES, the primary suspected

21  Canadian source of supply to the STUART DTO.  As summarized above, according to

22  Canadian law enforcement Trevor JONES is a Hell's Angels member and/or associate.

23  Records checks confirm that Trevor JONES did fly from Canada to Las Vegas, NV,

24  making entry into the U.S. on February 14, 2011.  Furthermore, DEA Las Vegas

25  confirmed that Trevor JONES was staying at the Aria Hotel, in room number 34-047

26  during this time frame.

27         90.     On February 21, 2011, STUART called LAMAR (TT-3 Session 146).

28  STUART asked LAMAR what he "ended up getting from DUB . . ." LAMAR responded

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 32

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   that he "pulled sixty and I only gave him ten, and he's ready to see me again." STUART

2   responded that he "might need you [LAMAR] to run some other errands too.  When you

3   go see him [DUB] just take paperwork to make a deposit in a bank . . ." They go on to

4   discuss girls and other business, including a reference to "SDs," which I know from my

5   training and experience to be slang for a type of marijuana.

6      91.    Based on the investigation to date, I believe "Dub" is John WASHINGTON.

7   As set forth above, WASHINGTON is a customer/member of the DTO and was

8   intercepted speaking to STUART during the first wiretap.  Based on the context, I believe

9   LAMAR is referring to having delivered, and planning to deliver, pounds of marijuana to

10  WASHINGTON.  LAMAR has been observed on surveillance at **Washington's residence**

11  on numerous occasions, engaged in conduct consistent with delivering controlled

12  substances.

13     92.    We also intercepted calls regarding a second meet between LAMAR (acting

14  at STUART's direction) and T. JONES ("Red").  On February 24, 2011, TT3, Session

15  #257, LAMAR, using 253-293-4947, tells STUART, "Um, I didn't catch an early flight. I

16  can catch one in a minute or, I was wondering if I can go tomorrow. Or does he need me

17  there today?" STUART says, "No. You gotta go. I already told him that you'd be there

18  between 10:00 and 12:00, and he's like." LAMAR interrupts, "All right, I can be there at

19  3:00, then." STUART says, "Okay, same room. You'll be in, right at, you'll be in at 3:00?"

20  The two discuss the time LAMAR will be at the room.

21     93.    Later STUART asks, "Okay, and to take another 20?" (Likely, $20,000).

22  LAMAR tells him, "Oh, yeah, I can do that."  The call ends shortly thereafter.

23     94.    Seattle agents were able to see LAMAR and a female companion before they

24  boarded their flight to Las Vegas and were able to determine what clothes LAMAR was

25  wearing.  Later, LAMAR we confirmed, by video surveillance, that LAMAR was at the

26  Aria Hotel.  The security team at the Aria Hotel also confirmed the description of LAMAR

27  and his clothing.  Based on this conversation, we believe that during this and the previous

28  trip LAMAR was delivering money to Trevor JONES, which the STUART DTO owes for

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 33

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   marijuana obtained from the JONES brothers.

2       95.    Also on February 24, 2011, TT3, Session #272, LAMAR calls to tell

3   STUART that he's landed. STUART tells LAMAR to make sure to get an e-mail address

4   from him. STUART also says, "Oh, okay, and then another thing that I want: If he asks

5   you any questions like what's in stock, you know?" LAMAR says, "Okay. Hello? Stock?"

6   STUART continues, "Say more than what we still have in stock, like in what you're

7   holding onto. Up it by a few more than we have, a couple hundred at least." LAMAR

8   says, "Oh! Okay. Stock." STUART continues, "Like five-plus... like what's in stock and

9   then say like three or four hundred of them are Kongs." STUART continues explaining

10   how many to add to the actual number then LAMAR asks, "Okay. Are we falling behind

11   or something? What's up?" STUART explains, "Well, yeah. I just want to make him think

12   that there's more than we've got. You know what I mean? It's still slow." LAMAR tells

13   STUART, "Alright, well me and my boys will hook it up." The call ends shortly

14   thereafter. During this call, STUART is telling LAMAR to overstate how much of the

15   undesirable Kongs (a strain of marijuana) they have, so that they will not have to absorb

16   any more of them into their stock and/or pay for the ones they have yet to sell.

17   **E.    COCAINE SEIZURES.**

18       96.    As set forth above, law enforcement seized more that $1 million in drug

19   proceeds from one of the DTO's pilots. The pilot agreed to work for law enforcement

20   (referred to as CI-3), in the hopes of obtaining consideration on his future federal charges.

21   Law enforcement provided CI-3 with fake police reports, purporting to show that the

22   seized cash was stolen from his airplane during a random break-in at an airport. STUART

23   and his associates believed this story.

24       97.    On March 24, 2011, CI-3 met with Jacob STUART. During their

25   discussion, STUART told CI-3 that there was a faster way to pay off the debt owed

26   (arising out of the million dollar seizure). STUART told CI-3 that they could start making

27   more money by flying the "other thing," meaning cocaine. STUART explained that the

28   cocaine would be flown from southern California to Bellingham, WA. STUART also

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 34

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1 | stated that they could make $500 per, meaning per kilogram, with a minimum of $25,000.

2 | 98.  During this discussion, STUART made it clear that flying this "other thing" was more serious, in his mind, than transporting marijuana; at one point, STUART said something to the effect of "I would not want them to know that is what we are doing, so I do not want him, if we had to buy a beater car, I mean, it is a pretty solid thing. They have had it going for a while. I just hate that and that shit, that is what I am looking at, like not being able to see my kids ever again. You know what I mean?"

99.  Based on this discussion, DEA Seattle put in a place a plan to arrange for an undercover (UC) to pick up the cocaine utilizing CI-3. CI-3 was directed to tell STUART that he could not fly the cocaine himself due to problems with his aircraft, but that he knew another pilot (in reality, a DEA UC) who would do so for $15,000 in cash.

100.  On April 1, 2011, CI-3 met with STUART who began to arrange for a pick up of cocaine in Santa Monica, CA. The two were together, with STUART receiving information from another person (likely Jason BARBOUR), which he relayed to CI-3. CI-3 in turn relayed information to the UC "pilot." CI-3 and STUART had previously discussed, during a number of recorded calls, the logistical arrangements for picking up the cocaine.

101.  At approximately 1:30 p.m., CI-3 told S/A Wilson that the cocaine was in a Chevrolet Astro van with damage to the front end. S/A Wilson located the vehicle and drove it to a safe location. S/A Wilson located a box in the back of the vehicle that contained ten kilograms of suspected cocaine. Two of the kilograms of cocaine were tested using a presumptive field test; both tested positive for cocaine. After unloading the cocaine from the vehicle, S/A Wilson returned and parked the vehicle at the prearranged drop location. The vehicle sat there until approximately 9:00 p.m., officers/agents observed a Nissan passenger car arrive. An unknown person exited from the vehicle and took possession of the van and then both departed.

102.  Later in this same day, CI-3 also met with Richard Lamar while Jacob STUART was present. LAMAR brought CI-3 a new phone which is a push-to-talk type,

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 35

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   which had STUART number programmed as "Harry" and LAMAR as "Slim."  LAMAR

2   gave CI-3 (at STUART's direction), $24,400.  Of that amount, $15,000 of this was to pay

3   the new pilot and the rest was for the repair of CI-3's own aircraft.  STUART is

4   continually asking CI-3 when the aircraft can be ready so CI-3 can fly marijuana once

5   again.

6        103.   On two occasions, agents attempted a controlled delivery of the ten kilos of

7   cocaine.  Both times the delivery did not take place due to various reasons.

8        104.   On April 8, 2011, CI-3 through STUART arranged for another pick-up of

9   cocaine at the same meet location as the ten kilo deal.  CI-3 made contact with STUART

10   via STUART's new phone, as witnessed by S/A Jack Wilson and S/A Brenna McIntosh.

11   During one of the directed calls with STUART, STUART provide a phone number that

12   CI-3 needed to contact, 310-729-4318.  Furthermore, STUART told CI-3 to use the code-

13   name"Arnold" when calling 310-729-4318, and that the user of that number would use the

14   code-name "Adam."  Also, CI-3 would need to ask "Adam" if he wants to go the gym

15   early tomorrow (a code or recognition phrase).  Also during this recorded call STUART

16   indicated these were different people (suppliers) than the last time (meaning the previous

17   ten kilo deal).

18        105.   CI-3 placed a recorded call to "Adam" at the 310-729-4318 phone number

19   and provided his/her name as "Arnold" and asked if he wants to go to the gym early

20   tomorrow.  CI-3 and "Adam" agreed for a time of 11:30 a.m. to conduct the drug

21   transaction and an address, which the CS texted to "Adam."  Eventually "Adam" provided

22   a description of the vehicle that would contain the cocaine, which an undercover would

23   locate and drive to a meet location.

24        106.   DEA LA Group 7 provided a UC to pose as the pilot for this operation.

25   Three boxes were located in the load vehicle, which were seized and transported to the

26   DEA office in Los Angeles.  The vehicle was then returned to the meet location.

27        107.   96 kilos of cocaine were ultimately seized from the boxes.  DEA Los

28   Angeles has since learned that the vehicle that transported the cocaine was rented by a

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 36

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1 | Canadian citizen.

2 |     108.   Also on April 8, 2011, David THOMSON arrived at Thun Airfield,
3 | Puyallup, WA, in Michael MURPHY's aircraft.  Surveillance observed Richard LAMAR
4 | drive **LAMAR's truck** to THOMSON on the tarmac.  Surveillance observed LAMAR
5 | and THOMSON load 11 hockey bags into the aircraft.  Later that evening, THOMSON
6 | flew the plan back to Yuba City airport, where agents watched him meet MURPHY and
7 | MURPHY's wife, Pamela.  MURPHY helped THOMSON push the aircraft back into
8 | MURPHY's hangar and they closed the door.  Later, all three left the area.  Still later,
9 | THOMSON flew the aircraft to Chicago, IL, with the marijuana where MURPHY
10 | distributed it to Frank LOZANO and others.

11 |     109.   On April 9, 2011, DEA Seattle, HSI Group 6, HSI Blaine, and other law
12 | enforcement conducted a controlled delivery of 106 kilos of "sham" cocaine.  STUART
13 | had told CI-3 to leave his/her truck at a Safeway in Lynnwood with the keys inside the
14 | vehicle at 5:00 p.m.  At approximately 5:24 p.m. an older white male was observed getting
15 | into the vehicle.  Subsequently, the white male was identified as Glen STEWART, a
16 | Canadian citizen.

17 |     110.   Surveillance followed the vehicle to a residence located in Custer, WA.
18 | STEWART unloaded the boxes from CI-3's vehicle into a shed behind the residence.
19 | Later STEWART was followed away from the residence in CI-3's vehicle, where a traffic
20 | stop was conducted.  STEWART was then detained.  Agents retrieved the boxes of
21 | "sham" cocaine.  STEWART did not cooperate with law enforcement and was released.
22 | Agents then departed.

23 |     111.   On April 17, 2011, at approximately 3:01 p.m., Jacob STUART using TT-3
24 | placed an outgoing call (call 1127) to phone number 253-261-8499, user Richard
25 | LAMAR.  During the call and after greetings, STUART asked LAMAR, "Not much, not
26 | much.  Do you, do we, do we, you have any way to get, get some, some heaters?"
27 | LAMAR asked, "Some what?"  STUART replied, "Some heaters, burners."  LAMAR
28 | said, "Oh.  I could, yeah, I could get some."  STUART replied, "Dude, I, yeah, they,

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 37

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  because they want some right now, our, our boss man does. Because they are sending
2  some people down to deal with the situation and . . ." LAMAR interrupted and said,
3  "Okay." STUART replied, "And he, and he says, and he is like, shit, I mean, I hate to say
4  I am . . ." LAMAR interrupts and said, "They are looking for something for a pocket,
5  something small?" STUART replied, "Something throw, I don't care. I don't think they
6  have to be small. They just want, want some straps and . . ." LAMAR interrupts, "I will
7  see what I can do."

8      112.   STUART went on "And then also they were saying do you have anyone that
9  could just get us some at least have some bats and some bear spray. If we can do that so,"
10  LAMAR replied, "I can get that together." STUART said, "I fucking, I hate to this to you
11  are about to leave just bring all this on you."" LAMAR asked, "When do you need this
12  done?" STUART replied, "ASAP."

13     113.   On April 17, 2011, at approximately 4:11 p.m., Jacob STUART using TT-3
14  placed an outgoing call (call 1133) to phone number 253-261-8499, user Richard
15  LAMAR. During the call and after greetings, STUART asked, "Yeah, he is on, thank god
16  that, he is on it, like they need those supplies now. He's got a crew down there and can,
17  can you get up?" LAMAR replied, "I am on the south side of the capital right now. I am
18  stopping in this store . . . To see what I can grab here. I am just thinking, your standard,
19  standard kit, I'd imagine, right?" LAMAR continued, "I mean, what are they like,
20  women's self-defense kind of stuff? Like a shocker and like mace?" STUART replied,
21  "Yeah or you, the Cabella's has like yeah, get." LAMAR interrupted, "That is where I am
22  at right now."[4] STUART replied, "But the, the only fucking problem with that dudes is
23  when you get those, when you get those fucking tasers and shit don't they take your name
24  and then shoot out a number? And make sure you don't fucking have your fingerprints on

---

26      [4] I know there is a Cabella's store near Olympia, which is the Capital of
27  Washington State, and that this location carries Taser devices, firearms, and sporting
28  goods.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   any of that shit.  Make sure you wipe that shit clean."  LAMAR replied, "Oh, dude, I

2   know."

3        114.   Based on my knowledge of this investigation, I believe that STUART helped

4   facilitate a 106 kilo cocaine transaction (total) that was conducted on April 1, April 8, and

5   April 9 2011.  STUART directed CI-3 to contact the UC pilot in order to obtain the

6   cocaine in southern California.  I believe that cocaine was destined for Canada and for the

7   Hells' Angels, possibly Trevor JONES.

8        115.   "Heaters," "burners," and "straps" are all common street terms for firearms.

9   I believe the reference to "boss man" may be a reference to Trevor JONES who had sent

10   or was sending some possible members or associates of the Hells Angels who were

11   requesting guns, bear spray, and bats.  I also believe it is likely that they intend to use these

12   implements on Glen STEWART who they believe ripped them of 106 kilos of cocaine.

13   These identified  individuals may have crossed from Canada into the U.S.

14        116.   Also on this date, surveillance was conducted of LAMAR where he was

15   followed to a sporting goods store where he purchased three bats.  There were several

16   more intercepted calls between STUART and LAMAR in an attempt to locate and obtain

17   guns.  STUART told LAMAR to call John WASHINGTON regarding obtaining guns.  At

18   this time, it appears that they, STUART and LAMAR have not been able to obtain the

19   guns for the individuals who were coming down to deal with the situation.

20                 **PROBABLE CAUSE TO SEARCH SPECIFIC LOCATIONS**

21   **A.   STUART'S RESIDENCE AND VEHICLES.**

22        117.   As outlined above, according to the CIs, Jacob STUART, a.k.a. "Shorty" or

23   "Slick," is the head of the DTO, and is responsible for the coordination and distribution of

24   marijuana and cocaine throughout the United States.  Both STUART and his wife, as well

25   as their vehicles (A **Black 2007 GMC Yukon**, and a **white 2006 Lexus**) have been

26   observed by surveillance at their residence on numerous occasions.  In addition, STUART

27   has been observed in the **Yukon** on a number of occasions meeting with the DTO

28   members that he is directing.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 39

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

118.   Brooke STUART is known to be a licensed real estate agent and investigators believe that Brooke STUART may be assisting with the laundering of drug proceeds through the use of her real estate related knowledge.  In particular, banking records indicate that Brooke STUART has made at least one cash purchase of land for approximately $100,000, which cannot be supported by the STUART's income listed on employment records, in 2010.  According to CI-3, STUART told them the STUART's actually paid $200,000 for the property, $100,000 "above the table" and $100,000 "under the table."  Brooke STUART drives the white 2006 **Lexus** GS44D.

119.   On February 23, 2011, the Honorable Magistrate Judge James P. Donohue signed a so-called "sneak and peak" delayed-notice search warrant for the **Stuart Residence** in Kirkland, WA.  Based on intercepted calls, we knew that STUART was out of town during this time period.

120.   The search of STUART's residence did provide some intelligence.  For example, agents located some drug ledgers, phone numbers, property records, more codes for phone numbers, Varinder KHAIRA's credit report (likely ordered for STUART by WOLVERTON, who has access to such reports as part of this employment, as discussed below), and other items of interest.

121.   No items of evidence were actually seized; they were either photographed, scanned, or annotated on notes by the agents.  The search warrant authorization permitted agents not to leave notice of this search.

**B.   LAMAR'S APARTMENT AND VEHICLES.**

122.   Richard LAMAR is currently residing at 5960 Terrace View Lane SE, Apartment H-206, Auburn, WA.  Agents obtained LAMAR's apartment rental records, in which he lists STUART as his employer at a salary of $5,000 a month.

123.   As outlined in the prior section, LAMAR has been repeatedly intercepted speaking to STUART over the wiretap, and taking instructions from STUART.  LAMAR is STUART's trusted "runner," picking up, storing, and delivering money and drugs on the DTO's behalf.  STUART has also used him as an intermediary to deliver money to Trevor

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 40

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  JONES, the DTO's likely source of supply in Las Vegas.

2      124.   As noted above, surveillance has observed LAMAR delivering suspected

3  marijuana to the pilots, MURPHY, THOMSON, and/or PARKER, at Pierce County

4  Airport (Thun Field) in Puyallup, Washington on multiple occasions.  LAMAR typically

5  uses **LAMAR's truck** to make those deliveries.  Furthermore, surveillance conducted at

6  the residence of WASHINGTON, who is discussed further below, has observed LAMAR

7  delivering suspected marijuana to, and picking up cash payments from, WASHINGTON at

8  this location on several occasions.

9      125.   As outlined elsewhere in this affidavit, LAMAR also uses his **VW Golf** to

10  meet with co-conspirators and do local deliveries, including to PROHASKA and

11  WASHINGTON.

12      126.   Based on the foregoing, I respectfully submit there is probable cause to

13  believe that LAMAR is conspiring to, and actively engaged in, trafficking in marijuana

14  and potentially other controlled substances.  I also respectfully submit that there is

15  probable cause to believe that evidence of those offenses, as described in Attachment B,

16  can be found at **LAMAR's residence** and detached garage, and in his vehicles, as

17  described in Attachment A.

18  **C.    THE RESIDENCE AND VEHICLES OF PROHASKA.**

19      127.   Phoebe PROHASKA is currently residing at 4003 SW 98th St, Seattle, WA

20  (**Prohaska's Residence**).  The investigation shows that she has acted as a courier for

21  drugs and cash on behalf of the DTO.

22      128.   On July 30, 2010, at approximately 8:10 p.m., LAMAR drove **Lamar's**

23  **truck** to **Lamar's apartment** complex in Auburn, WA.  Surveillance officers observed

24  LAMAR park his truck, walk to his garage, unit #62 and subsequently drive out in

25  **Lamar's VW**.  LAMAR was observed while taking several bags from the truck and

26  placing them into the back of the VW in the apartment parking lot, and then left the

27  apartment complex while driving the VW.

28      129.   Surveillance officers followed LAMAR to the Auburn Super Mall in

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 41

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  Auburn, WA, where he parked in the parking lot in several different locations. During

2  each stop, LAMAR looked around the lot nervously and appeared to be sending text

3  messages on a phone or other mobile device. LAMAR went into Sports Authority and

4  came out moments later with a bag of what appeared to be shoe boxes. Based on my

5  training and experience, I believe that this behavior, driving and looking around nervously

6  and changing locations, is consistent with LAMAR engaging in counter surveillance

7  activities.

8      130.   Later that evening, LAMAR left the mall parking lot and drove to the Wal

9  Mart located across the street from the mall. LAMAR parked the **VW**, and sat in it until

10 approximately 8:59 p.m., at which time he got out. Moments later, **Prohaska's Van**

11 pulled up to the driver's side of the **VW**. LAMAR got into **Prohaska's Van** and drove it

12 back to his apartment and parked it in his garage, unit #62. At approximately 9:17 p.m.,

13 surveillance officers observed LAMAR back **Prohaska's Van** into his garage, quickly

14 unload multiple items from the van into the garage, close the door, and drive away from

15 the apartment complex and eventually returned back to the Wal Mart parking lot in the

16 Van. This observation is consistent with LAMAR picking up contraband from a co-

17 conspirator for storage at his residence.

18     131.   At approximately 9:31 p.m., surveillance officers observed LAMAR return

19 to the Wal Mart parking lot in the Van. Surveillance officers observed LAMAR meet with

20 a white female, who was later identified as Phoebe PROHASKA, in this parking lot.

21 LAMAR and PROHASKA spoke briefly and then each re entered their respective cars and

22 departed the parking lot.

23     132.   PROHASKA drove directly to the Muckleshoot Casino in Auburn, WA.

24 Surveillance officers located PROHASKA inside the casino. A surveillance officer

25 engaged PROHASKA in conversation: she told the officer that her name is Phoebe and

26 that she was waiting to meet her boyfriend, who would be angry if he saw her talking to

27 another man. During the exchange, PROHASKA's Blackberry alerted that she had a

28 message. PROHASKA asked the surveillance officer if that was his "berry" or hers, then

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 42

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   took the phone from her large handbag and began texting.

2       133.   On July 31, 2010 at approximately 2:13 p.m., surveillance officers located

3   **Prohaska's Van** at **Prohaska's Residence**.

4       134.   On August 1, 2010, at approximately 6:12 p.m., SA Jack Wilson drove by

5   **Prohaska's residence** and observed **Prohaska's Van**, as well as a silver Chevrolet

6   Avalanche with Washington license B96167N, registered to "No Bull Pet Walking

7   Service" were parked in the driveway.  Public record database checks show that the

8   business is registered to PROHASKA, as well.  Based upon the exchange described above,

9   investigators believe that PROHASKA supplied LAMAR with marijuana in her Van,

10   which LAMAR backed into his apartment's garage, unit #62.

11       135.   Furthermore, based on surveillance of PROHASKA in the casino,

12   investigators believe that PROHASKA sent an encrypted text message to an unknown

13   recipient regarding supplying LAMAR with marijuana.  Investigators believe this is the

14   same Blackberry that she later refused to give the password to officers during her traffic

15   stop on August 3, 2010, as detailed next.

16       136.   On August 3, 2010, Shasta County Sheriff's Deputy Chris McQuillan

17   initiated a traffic stop on a silver Chevrolet Avalanche with Washington license B96167N,

18   for following too closely.  This is the same vehicle that SA Jack Wilson observed at

19   PROHASKA's residence on August 1, 2010.

20       137.   Deputy McQuillan made contact with the driver of the vehicle, who was

21   identified as Phoebe PROHASKA via her Washington State Driver's License.

22   PROHASKA told Deputy McQuillan that she was traveling to see her sick grandmother in

23   San Gabriel, CA.  Deputy McQuillan noticed that PROHASKA was extremely nervous

24   and was overly friendly.  Furthermore, Deputy McQuillan observed that the vehicle had

25   multiple air fresheners, that her key ring had three separate alarm fobs, and that the

26   passenger seat was filled with snack items and three unopened cans of Red Bull Energy

27   drink.  Training and experience has taught me that these are indicators of a drug trafficker,

28   who is attempting to the mask the odor of narcotics, as well as driving non stop during a

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 43

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1 | long journey.

2 |     138.   Deputy McQuillan asked for consent to search PROHASKA's vehicle and

3 | she declined. Deputy McQuillan had Shasta County Sheriff K 9 Handler Kropholler apply

4 | his K 9, Maximus, to the exterior of the vehicle. Maximus gave a positive response for the

5 | odor of narcotics emitting from the vehicle.

6 |     139.   Maximus was then placed inside the vehicle where again Maximus gave a

7 | positive result for the odor of narcotics. Upon conducting a search of the vehicle, two

8 | shoe boxes were located in the bed of the vehicle. These boxes contained several vacuum

9 | sealed bags of U.S. currency. Inside one box, the vacuum sealed bags were labeled "Pkg.

10 | 1," and had markings on the side that appeared to represent the amount of cash. In the

11 | second box, the vacuum sealed packages were marked "Pkg. 2," and again were labeled

12 | with the amounts. The total amount of U.S. currency seized was $656,900.

13 |     140.   An interview was conducted with PROHASKA after she was advised of her

14 | Miranda rights. PROHASKA agreed to answer questions. PROHASKA stated that she

15 | left Seattle on August 3, 2010, and was traveling to visit a friend, Carmen, in West

16 | Hollywood, CA, and to visit her sick grandmother. PROHASKA denied any knowledge

17 | of the currency that was located in her vehicle. PROHASKA stated that the tailgate does

18 | not lock and anyone could have placed it in there. PROHASKA also said that she had two

19 | cellular phones. The first was an iPhone that she utilizes for her business as well as for her

20 | personal use. PROHASKA stated she had a "gas station" phone, which she had purchased

21 | and was a pay as you go service. PROHASKA stated that she used this phone mostly to

22 | call her boyfriend, "Clyde," whom she claimed was married.

23 |     141.   PROHASKA was asked how many times she had driven money to Los

24 | Angeles. PROHASKA stated that this was the first time, thereby contradicting her

25 | previous statements.

26 |     142.   Three cell phones were seized in all from PROHASKA; the two previously

27 | mentioned and a Blackberry phone. PROHASKA stated that the Blackberry was not hers.

28 | PROHASKA was asked for the password for the Blackberry and again she reiterated that

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 44

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    it was not hers, and then she requested an attorney.  No further questions were asked.

2    143.   A further search of the Chevrolet Avalanche revealed a sophisticated trap, or

3    hidden compartment, that was accessible behind the backseat, where Maximus gave a

4    positive response for the odor of narcotics.  The trap was accessible using one of the key

5    fobs that discovered on her key chain.  No contraband was located in the hidden

6    compartment.

7    144.   We believe, based on training and experience, that PROHASKA was

8    transporting drug proceeds to Southern California.  Based on information received during

9    this investigation, these proceeds were likely going to be used by the DTO to pay for

10    cocaine.  Investigators believe that PROHASKA was utilizing the Blackberry in order to

11    maintain contact with Trevor JONES, Jacob STUART, or one of their associates.

12    145.   Also, officers downloaded the pre paid phone that PROHASKA referred to

13    as a "gas station" phone with telephone number 206 724 6640.  There were several texts to

14    phone number 206 669 2396 during a period of July 31, 2010 to August 1, 2010.  Here are

15    two that investigators believe pertain to drug proceeds:  "It had 100 and a few 50's in it."

16    This was sent on August 1, 2010.  "Hey 1 of ur stacks from da Louis bag only has 4,300 in

17    it."  This was sent on July 31, 2010.  Based on these texts, investigators believe this is

18    regarding the drug proceeds that were eventually seized on August 3, 2010.  Furthermore,

19    the reference to "da Louis" bag may be a reference to St. Louis, MO, where MURPHY and

20    THOMSON have transported drug proceeds from and to.

21    146.   Furthermore, investigators believe PROHASKA is having other unidentified

22    members, particularly FNU LNU, the white male driver of a Burgundy 2007 Chevy Tahoe

23    with Washington license ACN5641, registered to Luci R. Lucarrelli at 8408 36th Avenue

24    SW, Seattle, WA, who also resides in West Seattle, to transport either drugs or proceeds

25    for the DTO.

26    147.   Agents have requested and received vehicle rental records for PROHASKA.

27    An analysis of these records dating from November 15, 2007, to June 4, 2010, shows that

28    PROHASKA has rented numerous vehicles during this time, spending approximately

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 45

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   $18,433.11 to do so.  The total mileage for all of these vehicles during this time frame is

2   approximately 132,895 miles.  For instance, a vehicle rented by PROHASKA, a Chevrolet

3   Suburban, was rented on November 1, 2009 and returned on November 27, 2009.  The

4   total mileage listed on this vehicle rental recorded was 7,119 miles.

5        148.   On September 28, 2010, SA Jack Wilson and TFO Troy Swanson met with a

6   Waste Management employee, who acquired refuse, as witnessed by TFO Swanson at

7   PROHASKA's residence.  The following is a partial list of these items that were deemed to

8   be of evidentiary value; a Thrifty Car Rental receipt in the name of Phoebe PROHASKA

9   for a vehicle rented on February 23, 2010 and returned on March 5, 2010; a Thrifty Car

10  Rental receipt in the name of Phoebe PROHASKA for a vehicle rented on November 27,

11  2009 and returned the same day; an Enterprise Car Rental receipt in the name of Phoebe

12  PROHASKA for a vehicle rented on April 16, 2010 and returned on April 20, 2010; a

13  receipt dated June 17, 2010 for the purchase of four I-Phones at an AT&T store located in

14  Tukwila, WA, paid for in cash in the amount of $220.

15       149.   Based on what investigators have seen during this investigation thus far,

16  investigators believe that PROHASKA was and/or still is renting vehicles for the DTO in

17  order to transport narcotics or drug proceeds.  These vehicles are being driven by unknown

18  members of the DTO who are either transporting proceeds or narcotics throughout the

19  country based on the mileage.  Though the DTO is utilizing aircraft at this point in time to

20  transport marijuana and cash, and also has access to specially modified vehicles with

21  hidden "traps," it is also possible that the DTO is utilizing rental vehicles as well.

22       150.   Tolls analysis shows that at one time, there were two common numbers

23  calling one of STUART's phone numbers, 323 493 0568 and one of PROHASKA'S

24  phones with phone number, 206 724 6640.  The two common numbers between these

25  phones are 360 640 4962 and 323 627 4554.  Investigators believe these phones are used

26  by unknown members of the DTO and were called up to August 3, 2010 by STUART's

27  phone number, 323 493 0568.  Furthermore, based on the fact that PROHASKA had a

28  Blackberry, she may use this to communicate with either STUART or possibly Trevor

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 46

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  JONES.  Again, according to CI 1, STUART, Trevor JONES, and others within the DTO

2  are using these encrypted Blackberries to communicate with one another.

3    151.    On April 22, 2011, a Seattle Police Department drug dog handler applied his

4  canine to the exterior of **Prohaska's Van**, which was parked in her driveway.  The dog did

5  not alert on the vehicle.  However, based on my training and experience, this does not

6  definitively eliminate this vehicle as a conveyance for drugs and/or drug proceeds.

7    152.    Based on the foregoing, I respectfully submit there is probable cause to

8  believe that PROHASKA is conspiring to, and actively engaged in, trafficking in

9  marijuana and potentially other controlled substances.  I also respectfully submit that there

10  is probable cause to believe that evidence of those offenses, as described in Attachment B,

11  can be found at PROHASKA's residence, and in her vehicles, as described in Attachment

12  A.

13  **D.    PROHASKA'S STASH HOUSE (8805 35TH Avenue SW, Seattle, WA), and A**

14  **Burgundy 2007 Chevy Tahoe, Washington license ACN5641**

15    153.    This residence is associated with an unidentified white male, approximately

16  5'10", 160 lbs, with dark hair, who walks with a limp.  This unidentified male currently

17  resides at a different residence at 8408 36th Ave SW, Seattle, WA (West Seattle).  This

18  male has been observed driving **Prohaska's Van**.

19    154.    Investigators have also observed this individual driving a Burgundy 2007

20  Chevy Tahoe with Washington license ACN5641, registered to Luci R. Lucarrelli at 8408

21  36th Avenue SW, Seattle, WA on numerous occasions while at a suspected "stash"

22  residence located at 8805 35th Ave SW, Seattle, WA (West Seattle) (**Prohaska's Stash**

23  **House**), that investigators believe is being utilized by the DTO.  Furthermore,

24  investigators have observed this individual unload bags out of various cars and rental

25  moving vans into the garage of this residence.  It is suspected that these bags contained

26  cash.

27    155.    On August 4, 2010, DEA Group D 21 was conducting surveillance of

28  **Prohaska's Van**."  Agents observed FNU LNU West Seattle driving the vehicle.  During

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 47

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  the course of surveillance of this unknown white male, he conducted several "heat"

2  checks, driving in a manner calculated to detect law enforcement: starting and stopping for

3  no apparent reason, circling blocks, watching all other cars and drivers.

4      156.   Later in the day, investigators learned of the traffic stop of PROHASKA

5  from the previous night, which resulted in the seizure of money described above. During

6  surveillance, this unknown white male had driven the **Prohaska's Van** from his identified

7  place of residence at the time, 9402 36th Ave SW, Seattle, WA (West Seattle) to

8  PROHASKA's residence, located at 4003 98th Street SW, Seattle, WA. Investigators

9  believe this unknown white male, FNU LNU, is working for or with PROHASKA, and is

10  associated to the STUART DTO.

11      157.   On August 24, 2010, SA Jack Wilson conducted a trash pull at the suspected

12  "stash" residence located at 8805 35th Avenue SW, Seattle, WA. Some items removed

13  from the trash can located on the curb near the driveway of the residence were deemed to

14  be of evidentiary value: two calling cards, Verizon 563-234-4086 and Tracfone

15  1516-18534-49326; an activation card for a Tracfone with a portion of the

16  IMEI/MEID/ESN that could be read 79-004-773-180; a Rite Aid receipt listing a Verizon

17  Impulse card for $15.00; a dry cleaning receipt in the name of Jason Perry with phone

18  number 206-390-2346 (a silver Dodge truck with Washington license B11493S, registered

19  to Perry has been observed in the driveway of this residence on many occasions); a power

20  bill in the name of Brian Dixon, in the amount of $20.11 with the address 8805 35th Ave

21  SW, Seattle, WA.

22      158.   Investigators have determined that the utilities at this residence are being

23  paid by Brian DIXON, who also has a second residence in Seattle, according to public

24  utilities. Surveillance has observed vehicles registered to a Brian A. DIXON at this

25  residence on many occasions, but not on a consecutive basis that would indicate that he

26  resides there.

27      159.   SA Wilson queried law enforcement databases for the phone number of

28  206-390-2346. This phone number was listed to Luci Lucarrelli, who is believed to be the

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 48

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  sister of Gina Lucarrelli-OLSON, who was previously married to Trey OLSON.  As set

2  forth above, according to CI information, OLSON is a member of the DTO.

3      160.  Furthermore, a cream Lexus with Washington license 339XGA, registered to

4  Luci Lucarrelli, which the unknown white male, FNU LNU has also been observed

5  driving, has been observed parked in the driveway of this residence as well as at the

6  nearby residence located at 9402 36th Avenue SW, Seattle, WA.

7      161.  On September 7, 2010, SA Jack Wilson observed this unknown white male,

8  FNU LNU having dinner with PROHASKA at a restaurant in West Seattle.  Investigators

9  have since installed a camera at the suspected "stash" located at 8805 35th Avenue SW,

10  Seattle, WA, where surveillance has observed this same unknown white male arrive at

11  various times of the night, unloading items into the garage either late at night or during

12  early morning hours.

13      162.  For example, on September 12, 2010, at approximately 6:44 p.m., SA Jack

14  Wilson drove by the residence located at 9402 36th Avenue SW, Seattle, WA and

15  observed a **Burgundy Chevy Tahoe** with Washington license 855CVJ (now ACN5641)

16  parked on the street next to the residence.  At approximately 6:52 p.m., SA Wilson

17  observed as an unknown white male entered the driver's side of the Tahoe.  SA Wilson

18  confirmed that this was the same unknown white male who he observed on September 7,

19  2010 having dinner with PROHASKA, as well as driving **Prohaska's Van** during a

20  surveillance conducted on August 4, 2010.  At approximately 6:57 p.m., SA Wilson

21  observed as this unknown white male backed the Tahoe into the driveway of the **"Stash"**

22  residence located at 8805 35th Avenue SW, Seattle, WA.  The unknown white male then

23  exited the vehicle and entered the residence.

24      163.  Later that evening, at approximately 8:25 p.m., SA Wilson observed as the

25  unknown white male backed the **Burgundy Tahoe** even closer to the garage door of

26  **Prohaska's Stash House** and opened the garage door as well as the rear hatch area of the

27  Tahoe.  SA Wilson observed as the unknown white male loaded several items from the

28  garage into the rear hatch area of the Tahoe prior to departing the residence.  At

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 49

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   approximately 8:54 p.m., SA Wilson observed as the unknown white male returned to the

2   residence in the Tahoe, backed into the driveway, and retrieved an item from the rear hatch

3   area. The unknown white male placed the item on the ground before opening the garage

4   door and placing the item into the garage. At approximately 9:06 p.m., SA Wilson

5   observed as the unknown white male entered the Tahoe and departed the residence.

6        164.   Based on surveillance observations, no one seems to be living in this

7   residence. The window shades are always drawn and trash has only been placed outside

8   rarely since investigators identified the residence. Investigators believe that the items

9   loaded and unloaded by FNU LNU at the residence are either bags containing drug

10   proceeds or drugs. Investigators believe this unknown white male is working for

11   PROHASKA and was conducting "heat" checks on August 4, 2010 because he had already

12   been alerted to the traffic stop that was conducted on PROHASKA, resulting in the seizure

13   of currency.

14        165.   On April 20, 2011, we asked Officer Carl Zylak of the Seattle Police

15   Department (SPD) to apply his narcotics detection canine, "Zoe" to the exterior of this

16   suspected **Stash House**. Officer Zylak is assigned to the SPD Narcotics Unit. Officer

17   Zylak attended the Washington State Patrol (WSP) Narcotics Detection Canine Class in

18   2009. Their training consisted of approx. 223 hours of training in the classroom and

19   practical field applications. On Aug 7, 2009, "Zoe" and Officer Zylak were certified as a

20   Narcotics Canine Detection Team. Since certification they have conducted weekly

21   training together, in conjunction with other SPD narcotic detection canine handlers as well

22   as with other agency handlers. To date "Zoe" has had over 127 training applications with

23   384 finds, and over 158 search applications with 129 finds and 2 misses

24   "Zoe" is trained to detect flake cocaine, rock cocaine, heroin, methamphetamine, and

25   marihuana.

26        166.   On April 20, 2011, Officer Zylak applied Zoe to the exterior of the garage on

27   the north side of the residence; this part of the residence is open to the street and readily

28   accessible to the public. Zoe exhibited an alert behavior as she went down the driveway,

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 50

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1 │ observable when Zoe is in the presence of narcotics odor.  Zoe worked down the drive way

2 │ to the middle of the garage door and down to the west corner lower seam.  She then

3 │ followed up the retaining wall approx. 3 feet.  Zoe went back to the garage door, and

4 │ sniffed aggressively at the middle of the bottom seam of the garage door and then sat

5 │ indicating she was at the source of narcotics odor.

6 │     167.   As of this date, the FNU LNU with a limp has not been identified.  On

7 │ January 27, 2011, a SPD officer conducted a traffic stop of FNU LNU, who was driving in

8 │ LUCARELLI's **burgundy Tahoe**. FNU LNU presented no identification to the officer,

9 │ but gave the name of "John Davis," with a date of birth in 1976, Phone number:

10 │ 206-288-3934.  SA Lassiter ran database checks in NCIC, WA DOL as well as

11 │ commercial databases. One person with identifiable information was found  in another

12 │ state, with a matching name and date of birth,.  However, photographs obtained for this

13 │ individual did not appear to match FNU LNU. At this time, I believe that John DAVIS

14 │ may be a false name.

15 │     168.   Based on the foregoing, I respectfully submit there is probable cause to

16 │ believe that FNU LNU is conspiring to, and actively engaged in, trafficking in marijuana

17 │ and potentially other controlled substances.  I also respectfully submit that there is

18 │ probable cause to believe that evidence of those offenses, as described in Attachment B,

19 │ can be found at the suspected **Stash Residence** accessed by FNU LNU located at 8805

20 │ 35TH Avenue SW, Seattle, WA, and in the **Burgandy Tahoe**, as described in Attachment

21 │ A.

22 │ **E.      THE RESIDENCE AND VEHICLES OF JOHN WASHINGTON.**

23 │     169.   John WASHINGTON is currently residing at 6300 39th Ave South, Seattle,

24 │ WA (**Washington's Residence**) according to surveillance conducted at the residence.  The

25 │ legal owner of the residence appears to be a relative of WASHINGTON'S.

26 │ WASHINGTON is a local customer of the DTO.  He is also believed to have secured

27 │ other customers for the DTO's marijuana in other states, and has been repeatedly

28 │ intercepted discussing drug transactions with STUART.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 51

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

170.   LAMAR has been observed making suspected drug deliveries and cash pickups from **WASHINGTON's residence**, and SA Jack Wilson believes that WASHINGTON is purchasing marijuana from the DTO for resale in the Seattle area. WASHINGTON may also be assisting with the distribution of marijuana in Atlanta, Georgia.  In particular, CI-1 stated that STUART reached out to WASHINGTON for his drug contacts in both Western Washington and Atlanta.  According to tolls analysis, WASHINGTON's phone number, 206 291 3737, has numerous calls to phone numbers with the Atlanta area code of 404.  This number for WASHINGTON has also been in contact with previous phone numbers identified for OLSON and STUART.

171.   On July 5, 2010, Joshua TIANO (hereafter TIANO), who was driving a recreational vehicle, was pulled over by the Putnam County Sheriff's Office in Indiana for unsafe lane movement and improper plate display.  TIANO's passenger was Raymond BAILEY.  Officers asked to search the vehicle and TIANO denied consent.  Officers developed probable cause to search the vehicle after a drug detecting K 9 gave a positive response for the odor of narcotics in the vehicle.  Officers searched the vehicle and discovered approximately 500 pounds of marijuana and $13,300 in U.S. currency inside the RV.

172.   One of TIANO's mobile phones was also discovered in the vehicle.  It was determined that the phone had recently been in contact with WASHINGTON's phone number, 206 291 3737.  Investigators believe that TIANO was transporting marijuana for the DTO and that he has previously supplied marijuana to WASHINGTON, based on the download of TIANO'S cell phone, which listed WASHINGTON's phone number.

173.   On August 26, 2010, DEA Group D 21 conducted surveillance of LAMAR, who was driving **Lamar's Truck.**  At approximately 9:28 a.m., surveillance officers observed **LAMAR's truck** parked near the sidewalk of the **Washington's Residence.**  At approximately 9:36 a.m., surveillance officers observed LAMAR exit from this residence while carrying a bag that was approximately 2 feet by 2 feet.  LAMAR placed this black bag behind the passenger seat of his truck and drove back to his apartment complex

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 52

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    located in Auburn, WA.

2       174.    Investigators believe that LAMAR had just delivered marijuana to

3 WASHINGTON and LAMAR was picking up payment for the drugs. Additional

4 surveillance, as well as a camera that was installed near WASHINGTON's residence,

5 shows that LAMAR has been there multiple times. During those visits, surveillance has

6 observed LAMAR both dropping off and picking up items, consistent with conducting

7 drug deliveries and picking up proceeds.

8       175.    For example, on September 4, 2010, at approximately 3:42 p.m., SA Lassiter

9 observed LAMAR arrive at **WASHINGTON's residence** in his black **VW** and back into

10 the driveway. A Short time later, a gold Cadillac with Washington license AAM6652

11 drove up to the residence and WASHINGTON got out of the vehicle. A green Chevrolet

12 truck with Washington license A93938V also pulled in front of the residence and an

13 unidentified black male exited the truck. WASHINGTON, LAMAR, and the unidentified

14 male all entered the residence.

15       176.    At approximately 4:35 p.m., all three men exited the residence, got into their

16 respective vehicles and drove away. At approximately 6:58 p.m., LAMAR returned to

17 **Washington's residence** in his **VW** and met with WASHINGTON in the driveway.

18 LAMAR backed the VW up to the garage door and WASHINGTON opened the door.

19 WASHINGTON then removed one medium sized dark colored bag from the rear

20 hatchback area of the VW and LAMAR removed another similar dark colored bag from

21 the same area and they placed the bags in the garage. LAMAR placed what appeared to be

22 the spare tire cover back into the hatchback area. After closing the hatch on the VW,

23 WASHINGTON and LAMAR both entered the garage and closed the garage door. At

24 approximately 8:11 p.m., SA Lassiter observed as the VW pulled away from the residence

25 but due to darkness, could not tell who was driving the vehicle.

26       177.    On September 8, 2010, at approximately 6:07 p.m., SA Jack Wilson

27 observed LAMAR arrive at **WASHINGTON's residence** in his **VW**. LAMAR parked in

28 the driveway and entered the residence. At approximately 6:09 p.m., SA Wilson observed

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 53

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  as a black male, believed to be WASHINGTON, left the residence and walked towards the

2  VW in the driveway.  A short time later, WASHINGTON walked back towards the

3  residence from the passenger side of the VW while carrying a medium sized blue gym bag

4  and entered the residence.  At approximately 6:32 p.m., SA Wilson observed LAMAR exit

5  the residence while carrying a briefcase that was brown in color.  LAMAR entered the

6  VW and departed from the residence.

7      178.    On September 9, 2010, TFO Troy Swanson met with Waste Management in

8  order to retrieve refuse that was placed at the curb of **Washington's residence**.  An

9  employee of Waste Management retrieved the refuse at this residence and ensured that it

10  was segregated from any other refuse.  TFO Swanson obtained and transported the refuse

11  to the DEA Seattle Field Division Office.  SA Jack Wilson examined the refuse and

12  obtained the following items of evidentiary value:  a pound-capacity plastic bag that was

13  ripped open and had an annotation of "75 Kush" (known to be a type of B.C. Bud) on it; a

14  smaller size ziplock bag with an annotation of "Blue Dream" (known to be a type of B.C.

15  Bud) on it; a digital scale (Tanita Model 1479); smaller plastic baggies; a Bank of America

16  ATM receipt dated 09-08-10 for $2,500 with Reference #620102148, Ranier Valley

17  Banking Center, Checking 3:  ****4150; a Federal Express package addressed to John R.

18  WASHINGTON at 333 Gale PL S, Apt 5, Seattle, WA; a pill bottle with a phone number

19  of 253-838-2892; a Safeway receipt with the name of Stephanie Puckett.  Seattle Police

20  Department K-9 Handler, Carl Zylek applied his drug detecting K-9, Zoe, to the packaging

21  material (plastic bag, and ziplock bag) and scale that was seized.  K-9 Zoe gave a positive

22  alert to the odor of narcotics on the items.

23      179.    On January 25, 2011, a call was intercepted on TT-1 to phone number

24  206-473-0727 (call #219).  It has since been determined that WASHINGTON is the user

25  of this phone number, 206-273-0727.  After their initial greetings, STUART tells

26  WASHINGTON, "I am kinda in the neighborhood."  WASHINGTON replied, "Yeah,

27  where you located?"  STUART stated, "By the Teriyaki spot.  I am headed that way."

28  WASHINGTON replied, "It is going to take me about twenty minutes to get over there."

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 54

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

STUART asked, "Oh, to your house?"  WASHINGTON affirmed and STUART said, "I will just head that way.  I will get something to eat there and then I will come."  The call terminated a short time later.

180.    At approximately 2:14 p.m., SA Wilson observed **Stuart's Yukon** arrive and parked to the north of **WASHINGTON's residence** on South Graham Street.  At approximately 3:00 p.m., SA Wilson observed STUART exit from WASHINGTON's residence, enter his GMC Yukon, and depart.  At approximately 3:03 p.m., SA Wilson observed WASHINGTON carry a cardboard box that was approximately 2 feet by 2 feet in diameter to his Chevrolet Tahoe, where he placed it inside the front passenger side of the vehicle.

181.    On February 21, 2011, STUART called LAMAR (TT-3 Session 146). STUART asked LAMAR what he""ended up getting from DUB . . ."  LAMAR responded that he "pulled sixty and I only gave him ten, and he's ready to see me again."  STUART responded that he "might need you [LAMAR] to run some other errands too.  When you go see him [DUB] just take paperwork to make a deposit in a bank . . ."  They go on to discuss girls and other business, including a reference to "SD's," which I know from my training and experience to be slang for a type of marijuana.

182.    On March 3, 2011, TT1, Session 584, WASHINGTON tells STUART, "Boss. I run down that guy, he done been busted by the police."  STUART asks for details. WASHINGTON explains that the unidentified person had $131,000, that he scraped together, and 130 "tennis shoes" (presumably code for drugs) and that the police got both and he barely got away.  WASHINGTON goes on to say that this unidentified person ran away from the police, but that he left his identification in a car at the location where the "bust" happened.  Furthermore, WASHINGTON says that the person has told him that his own people have given him up to the police and expects to be arrested any time. WASHINGTON believes that he and STUART are not known by the people that are. talking and that they likely do not have anything to worry about.  WASHINGTON goes on to describe a "guy with one arm," whom STUART does not seem to know.

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

183.   On March 4, 2011, TT3, Session 509, STUART tells LAMAR about a loss, presumably the one described above by WASHINGTON.  STUART tells LAMAR the loss is all on "Dub" but that he'll help him out.

184.   Agents confirmed that on January 13, 2011, DEA St. Louis executed a consent search where they seized approximately $140,000, which was supposed to be payment for STUART as well as approximately 88 pounds of marijuana that was supplied by the STUART DTO.  During the search, agents also found 3 hand guns.  There was, in fact, a person missing part of an arm associated with this seizure, and another individual got away while leaving behind their ID.

185.   Later, during TT3, Session 511, LAMAR tells STUART he's at Dub's house and that he has new lines for STUART, himself and Dub.  WASHINGTON gets on the phone and STUART asks how the unidentified person got back without his ID.  STUART sounds suspicious of the reported loss, saying it sounds fishy, and asks for all the information.  WASHINGTON says he does not have it, but can get copies.  STUART says he needs to see the information [police reports].  WASHINGTON and STUART discuss supplying other contacts in other areas including "Vicky's" (code for Atlanta, GA, based on Mike Vick having played for the Atlanta Falcons) and working out a pay-back plan for WASHINGTON.  STUART tells WASHINGTON he is lucky because he has lowered his prices.  Near the end of the call STUART asks if WASHINGTON has a good sized check for him, not "just the thirty."  WASHINGTON tells him, "It's like a fifty cent CD" (likely meaning $50,000).

186.   Based on the investigation to date, I believe "Dub" is John WASHINGTON. As set forth above, WASHINGTON is a customer/member of the DTO and was intercepted speaking to STUART during the first wiretap.  Based on the context, I believe LAMAR is referring to having delivered, and planning to deliver, pounds of marijuana to WASHINGTON.  LAMAR has been observed on surveillance at **WASHINGTON's residence** on numerous occasions, engaged in conduct consistent with delivering controlled substances.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 56

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

187.    Based on the foregoing, I respectfully submit there is probable cause to believe that WASHINGTON is conspiring to, and actively engaged in, trafficking in marijuana and potentially other controlled substances.  I also respectfully submit that there is probable cause to believe that evidence of those offenses, as described in Attachment B, can be found at WASHINGTON's residence, as described in Attachment A.

**F.    ARTIACH'S RESIDENCE.**

188.    Issac ARTIACH currently resides at 13327 Puget Sound Blvd, Edmonds, WA (**Artiach's Residence**).  ARTIACH has been identified by CI-1, by use of his driver's license photograph with all other identifying information removed, as "Isaac," a "catcher" for the STUART DTO.  CI 1 stated that once the marijuana is smuggled across the Canadian border into the United States, the marijuana is then stored at ARTIACH's residence.  Surveillance has placed LAMAR at this residence, and tracker data has confirmed that LAMAR has been at this residence on several occasions.

189.    On August 18, 2010, DEA agents established surveillance on LAMAR at his apartment complex.  At approximately 12:05 p.m., Task Force Officer (TFO) Troy Swanson observed LAMAR exit his apartment building (Building H) and enter his **VW**. Surveillance officers followed LAMAR to **ARTIACH's residence**, where he parked in the driveway.  This residence is located in a remote area near Picnic Point Park on the Puget Sound.  At approximately 2:38 p.m., LAMAR left the residence in the VW and drove around the nearby vicinity in a circuitous manner, looking at vehicles parked in the parking area of Picnic Park.  After approximately five minutes of driving, in what appeared to be in a manner to detect law enforcement vehicles, LAMAR returned to the residence.

190.    At approximately 2:48 p.m., surveillance officers observed as LAMAR left **Artiach's residence** in the **VW** and traveled southbound on Interstate 5 (I-5).  GS Rich Hudon observed LAMAR exit off of I-5 at 220th Street in Mountlake Terrace, WA and noticed that LAMAR was looking in his rear view mirror at the drivers of other nearby vehicles and appeared to be nervous.  At approximately 3:05 p.m., surveillance was

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 57

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  terminated as LAMAR traveled eastbound on 220th Street in Mountlake Terrace, WA.

2  191.   On September 8, 2010, SA Jack Wilson displayed a Washington driver's

3  license photo without any identifying information of Isaac ARTIACH to CI-1.  CI-1

4  positively identified the person in the photo as being "Isaac."  CI-1 stated that ARTIACH

5  is receiving ("catching") loads of marijuana for the STUART DTO.  CI-1 stated that

6  ARTIACH resides near Mukilteo, WA in a house that overlooks the bay and has a long

7  driveway.  CI-1 said that ARTIACH told him that he rented the house because it is

8  difficult for law enforcement to observe.  Furthermore, CI-1 said that ARTIACH is

9  obtaining marijuana from "Red," identified as Trevor JONES and also from Humboldt

10 County, CA.  CI-1 stated that they are not sure how the marijuana is getting to

11 ARTIACH's residence, but told agents that it was stored in a room located inside the

12 residence.  Once the marijuana arrives, ARTIACH divides up the marijuana for

13 distribution.  CI-1 has seen approximately 300 to 400 pounds of marijuana at ARTIACH's

14 residence.  According to CI-1, this marijuana was packaged in U-Haul boxes and labeled

15 as dishes, and linen, etc., as if someone was moving.  CI-1 stated that on two occasions

16 he/she was with STUART when he/she obtained approximately 100 pounds of marijuana

17 each time from ARTIACH's residence.  According to CI-1, on one of the occasions, he/she

18 was present when STUART sent "Red" an encrypted text message regarding the marijuana

19 from his Blackberry.  "Red" replied back to STUART, indicating that STUART was only

20 getting 100 pounds of the marijuana that was at the residence.  STUART told CI-1 that he,

21 STUART, should not have sent the text to "Red" and should have just taken it all, meaning

22 the marijuana.

23 192.   Based on the foregoing, I respectfully submit there is probable cause to

24 believe that ARTIACH is conspiring to, and actively engaged in, trafficking in marijuana

25 and potentially other controlled substances.  I also respectfully submit that there is

26 probable cause to believe that evidence of those offenses, as described in Attachment B,

27 can be found at ARTIACH's residence, as described in Attachment A.

28

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 58

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

G.    **WOLVERTON'S RESIDENCE AND VEHICLES.**

193.    Robert James WOLVERTON currently resides at 209 10th Ave S, Kirkland, WA 98033 (**Wolverton's Residence**).  WOLVERTON is believed to be the user of 425-327-9776, which has been intercepted in phone calls with Jacob STUART on TT-1, as will be described elsewhere in this affidavit. WOLVERTON is believed to be a drug dealer/facilitator for the STUART DTO.

194.    As outlined above, WOLVERTON was intercepted speaking with STUART on January 15, 2011, about marijuana trafficking.

195.    On January 27, 2011, (Session No. 250) WOLVERTON and STUART arranged to meet the next morning.

196.    On January 28, 2011, surveillance was established at STUART's house in Kirkland, WA. At approximately 8:15 a.m. a black GMC Yukon (**Wolverton's Yukon**) with Washington license 190VNG, registered to Robert J. WOLVERTON at 209 10th Avenue S, Kirkland, WA arrived at STUART's residence. The surveillance officers observed a white male with black or dark hair get out of the vehicle and go into STUART's house. After the man left STUART's house, surveillance followed him to Bothell, WA and the Cobalt Mortgage Company. Surveillance officers identified the driver as WOLVERTON.  WOLVERTON parked the vehicle on the east side of the building and went inside.

197.    A search of public Internet websites revealed that WOLVERTON works at Cobalt Mortgage Company. Additionally, WOLVERTON's Facebook social network website reveals that he is "Facebook Friends" with both Jacob STUART and Brooke STUART, as well as "Jim Benham," whose Facebook picture shows him to be James BENHAM, who is also believed to be working for the DTO as a vehicle "trap" builder.

198.    Special Agent Steve Carnathan, operating a portable pen register and trap and trace device pursuant to an order issued in this district, renewed and authorized on January 20, 2011, by the Honorable U.S. Magistrate Judge Brian A. Tsuchida, confirmed that the phone or mobile device assigned the phone number 425-327-9776 was present at

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 59

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   or near STUART's house while WOLVERTON was present.

2       199.   Based upon the intercepted TT 1 conversations, the surveillance

3   observations, and the data gathered from the pen register, trap and trace device, I believe

4   that WOLVERTON is the one using 425-327-9776, and that he is acting as a middle man

5   or facilitator for the STUART DTO, helping to provide marijuana and collect payments

6   and drugs from Varinder KHAIRA and Mondier KHAIRA, as well as their father, Parmjit

7   KHAIRA, who appears to be a knowing participant.

8       200.   It also appears that during every call intercepted to date between STUART

9   and the person I believe to be WOLVERTON, they discuss another person referred to as

10   "V." "V" was initially identified only by the first initial but in later calls, WOLVERTON

11   refers to "V" as "Varinder." STUART and WOLVERTON are focused on finding "V,"

12   who owes the DTO money and/or drugs.

13       201.   I believe that WOLVERTON is referring to Varinder KHAIRA. On

14   February 3, 2011, during TT-1 Session No. 345, WOLVERTON provided the address of

15   Varinder's father (Parmjit KHAIRA) to STUART. The address provided by

16   WOLVERTON is the same address listed for Parmjit KHAIRA in Washington State

17   Driver License records. As the calls progress, it becomes apparent that STUART and

18   WOLVERTON have not been able to make workable arrangements for STUART's people

19   to pick up some "checks" (drug proceeds) and "work" or "food" (code for either drugs or

20   drug proceeds) from those working with Varinder.

21       202.   On January 31, 2011, there were multiple calls during which it appears

22   STUART attempted to call the people working with "V." STUART tells WOLVERTON

23   that the person he was supposed to call about picking up claims to have no idea what he is

24   talking about and have subsequently turned off his phones. As these calls progress,

25   STUART and WOLVERTON appear to become more frustrated.

26       203.   For example, on January 31, 2011, during Session No. 292, WOLVERTON

27   advises STUART, "Um, you wanna tell him that, uh, you know, um, I don't know what. I

28   imagine that those guys know his real name. Just say, "V" That's the first initial of his

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 60

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  name. Just say 'V' gave me this number, gave me this address.  I just need to talk to

2  somebody. Need to figure out what's going on." STUART tells WOLVERTON, "Yeah,

3  I'm not gonna say he gave me the address cause that would freak me out, if I was

4  somebody . . . I mean, that he even did that just blows my mind, you know what I mean?

5  It's like, dude, what the fuck? Who the fuck does that?" I believe STUART is amazed

6  how "V" is giving out too much information such as the address regarding this transaction

7  they are attempting to conduct.

8      204.    A short time later, on January 31, 2011, during Session No. 298, STUART

9  tells WOLVERTON, "I can't believe that he wouldn't stay on his phone for something this

10  important, like stay close to his phone to make sure it went good." STUART later

11  continues, "I mean, how would you, I don't understand with something worth so much,

12  especially with what's supposed to be there paperwork wise AND the other thing? It's like,

13  dude, are you kidding me?" I believe STUART is amazed that Varinder KHAIRA would

14  not answer his phone due to the amount of money and drugs involved.

15      205.    On January 31, 2011, during TT 1 Session No. 301, STUART and

16  WOLVERTON continue to discuss the customer they cannot reach. WOLVERTON

17  finally says, "Well, I guess, I figure at this point we'll probably just, uh, hopefully get

18  connected tomorrow. If not, I got all, I got his dad's cell phone number, and I'm sure he,

19  fucking, his dad knows what goes on. So . . ." STUART interrupts, "Yeah, well, his

20  brother, his other, his brother said that he, that he knows what was going and was [stutters]

21  offered to hand over the three hundred. So . . ." WOLVERTON asks STUART to repeat

22  the last. STUART says, "Well, his, his bro said that he told his dad and his dad was

23  offering up three hundred." WOLVERTON says, "Oh. Yeah, yeah, yeah." STUART

24  says, "So, what I was gonna say was, 'I'll take a little more than that.'" The conversation

25  appears to get interrupted by an unknown female and ends shortly thereafter.

26      206.    Later, in Session No. 305, WOLVERTON instructs STUART, "Hey, why

27  don't you try calling his main number with your 2 5 3? I bet you he answers because that's

28  his parent's area code." [WOLVERTON seems to think the familiar area code will cause

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 61

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  the person to answer his phone.] WOLVERTON continues, confirming that STUART

2  should call on the number he, WOLVERTON, just called STUART (meaning TT 1).

3  WOLVERTON begins to tell STUART a phone number, beginning, "4 2 5," but the phone

4  call ends abruptly, as if the call dropped. However, almost immediately after the call ends

5  STUART places a call using TT 1 to 425 737 7460, but this call was not completed. SA

6  Lassiter ran this number through commercial database (CLEAR) and found out it was

7  associated to Varinder Singh KHAIRA. This is relevant since, based on intercepted calls

8  described below, Jacob STUART and Jason BARBOUR are looking for Varinder

9  KHAIRA to collect money and marijuana owed.

10       207.    On February 1, 2011, in TT 1 Session No. 324, STUART and

11  WOLVERTON confirm the identity of Varinder KHAIRA. WOLVERTON tells STUART

12  that he spoke with the customer's dad. According to WOLVERTON, Varinder KHAIRA's

13  father, who is Parmjit KHAIRA, told him, "Varinder, he's like terrible with money. You

14  can't give him money." And later, WOLVERTON says that Varinder's dad said that

15  Varinder is "used to two to three thousand dollars from his nine to five? and he'll go out

16  and spend money on drinking and girls. Blah, blah, blah." STUART says, with a sarcastic

17  tone, "This is a little bit more than that." WOLVERTON says, "Yeah [laughing]. I'm sure.

18  He can party for a fucking week and half. Uh, so yeah, he basically said that, uh, well, one,

19  he's not telling Alex, cause he doesn't want to stress Alex out with his disease. He hasn't

20  talked to him in two months and, uh, that if he calls him, he'll definitely tell him, one: tell

21  him to call me; but, two: call me as well and let me know. And I told him that he needs to.

22  I said, 'If there's any contact anywhere, like, it needs to, it needs, the message needs to be

23  delivered cause his health, his health is in jeopardy.'" STUART asks WOLVERTON if he

24  knows Varinder's parents and WOLVERTON confirms that he knows the family very

25  well, as well as having all the information on Varinder, and how to locate him.

26       208.    On February 25, 2011, TT1, Session #477, STUART speaks to Robert

27  WOLVERTON on 425-327-9776. STUART and WOLVERTON continue to discuss

28  finding Varinder KHAIRA, whom they believe owe them a great amount of money and

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 62

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   drugs. STUART says, "Uh, yeah, so I had a guy check that area that his area code is, for a

2   bill, he's got no bills in his name, no action on his credit card, uh, what else? And did I tell

3   you that I went to the house and somebody else lives there?"

4       209.   Later STUART discusses what he has done to find Varinder KHAIRA, "But,

5   I've had someone on his lady's house. Hadn't seen anyone leave, but there definitely is, you

6   know, someone's there and it's definitely her house, so. I mean, we do have that and his

7   phone number, so, uh, it's just the next step. I'm finding out if this private detective can

8   triangulate and if he can't, um, I might let his brother's asking me to have the phone

9   number." WOLVERTON asks, "Have his brother call him or something?" STUART

10  replies, "Yeah. What do you think? I said, I basically want him tell him, you know, 'I got

11  this phone number from them, they've been outside your fucking baby's momma's, you

12  know, um, and I talked him out of just going and grabbing her and saying, you know, trade

13  you for her type of shit. That's where it's at. This is no joke.' You know?" STUART then

14  re-states that he is waiting for the private detective to determine if he can "triangulate" the

15  phone number. This call continues for a while as STUART relays much of the information

16  and conversation he had with 'the bro', Mondier KHAIRA, in Session #224, which

17  indicates that the previously unknown male using 206-437-1582 may be in fact, Mondier

18  KHAIRA.

19      210.   On March 4, 2011, over TT-1, Sessions 595, 597, 599, it appears, based on

20  voice comparisons, that WOLVERTON, using STUART's line, calls the T-Mobile

21  customer service line.  During these calls WOLVERTON tries to convince the different

22  service representative that he is Varinder KHAIRA and that he has moved.

23  WOLVERTON asks the representatives to tell him what address is on file for the account

24  (KHAIRA's account).  The representative tells him that the number has been canceled and

25  she cannot give out the new number.  WOLVERTON then hung up and tried to get the

26  next representative to give the new number.

27      211.   Based upon the foregoing, I believe that WOLVERTON has been working

28  with STUART to coordinate the pick up of drugs and/or money from Varinder KHAIRA's

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 63

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  contacts on the East Coast.  I further believe that they are in the New York/New Jersey

2  area because Varinder KHAIRA has ties to that area and was arrested there as recently as

3  December 2010.  According to the calls, "Alex" and Varinder's dad also are involved in

4  this deal, and Varinder KHAIRA is, in fact, paying part of "his bro's" tab. Previous

5  encounters with law enforcement have revealed that Mondier KHAIRA goes by the name

6  "Alex."  During later calls, WOLVERTON works with STUART to locate Varinder

7  KHAIRA to collect a drug debt, including by posing as "V" during calls with his cell

8  carrier.

9       212.   I also note that a copy of Varinder KHAIRA's credit report was recovered

10  during the "sneak and peak" search of **Stuart's Residence**.  As a mortgage broker,

11  WOLVERTON has access to credit reports, and it is a logical conclusion that

12  WOLVERTON secured that report and gave it to STUART.

13      213.   In short, there is probable cause to believe that WOLVERTON is a member

14  of the conspiracy, and that evidence of the conspiracy can be found at his residence.

15  **H.    TREY OLSON's BLACK BMW, AND THE PERSON OF TREY OLSON**

16      214.   Trey OLSON is believed to currently reside in Seattle at his father's

17  residence, located at 8904 41st Avenue SW, Seattle, WA (West Seattle). Previously,

18  OLSON resided at 5645 California Avenue, SW #B, Seattle, WA (West Seattle), which

19  was being used as a stash house, according to CIs. The stash house has recently been sold,

20  but CI-1 identified this residence as the location where the STUART DTO stored large

21  quantities of marijuana. CI-2 also directed investigators to OLSON's residence, and told

22  investigators that he/she and STUART both picked up marijuana at that location.

23      215.   CI-2 also recognized OLSON from an encounter that took place in March

24  2010 in Cleveland, OH.  On that occasion, CI-2 was instructed to rent a hotel room, where

25  he/she put approximately 40 pounds of marijuana that he/she picked up earlier in another

26  city from MURPHY. BARBOUR and OLSON came to the hotel and instructed him/her to

27  go downstairs and wait in the bar.  BARBOUR and OLSON were supposed to be

28  introducing CI-2 to the DTO's contact there in Ohio, but the contact insisted on only

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 64

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    meeting with BARBOUR.  When CI-2 returned to the hotel room, the marijuana was gone

2    and there was a suitcase containing over $400,000 inside, with a note indicating the exact

3    amount; CI-2 cannot remember the precise figure that was on the note.  CI 2 said that

4    he/she left the suitcase in the hotel room, but was told later that Kenneth ADEE picked it

5    up later that day.

6        216.   On May 18, 2010, surveillance was conducted by DEA Seattle, where

7    surveillance officers observed STUART and OLSON meeting in the area of 9th Ave and

8    Harrison St, Seattle, WA.  STUART and OLSON were inside OLSON's silver Dodge

9    truck with Washington License plate A28653T.  The meeting lasted approximately 36

10   minutes.  Agents observed STUART exit from the passenger side of OLSON's vehicle and

11   walk back to his vehicle.  STUART and OLSON then departed the area and drove to their

12   homes.  Investigators believe this meeting was regarding drug transactions and possibly

13   involving a separate DEA Fresno investigation into Jason BARBOUR.  Investigators

14   believe they met inside OLSON's vehicle in order to avoid speaking on the phones, to

15   evade any law enforcement wire intercept of their conversation.

16       217.   OLSON moved to Atlanta, GA, not long after agents observed this meeting

17   between STUART and OLSON.  We believe that OLSON was helping BARBOUR, who

18   was "hiding out" from DEA Fresno's investigation.  However, OLSON's vehicles were

19   seen parked in STUART's driveway repeatedly, indicating that he was going back and

20   forth between Seattle and Atlanta.

21       218.   On January 13, 2011, at approximately 8:13 p.m., STUART using TT 1

22   received an incoming call from 404 918 8040 (Session 104), during which two males

23   (UM8040 and OLSON) speak with STUART.  As set forth below, I believe the first

24   speaker, UM8040, is a customer of the DTO, and that the second person is OLSON.

25       219.   During the call, UM8040 tells STUART that he is out with their mutual

26   friend.  STUART said, "Oh he came?"  UM8040 then stated, "Yeah, yes.  Awful weather,

27   man, I was surprised."  STUART replied, "His phone been dead, so I didn't know

28   what . . " Later in the call, UM8040 told STUART, "We haven't been able to do any yet, I

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 65

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  mean, it's just like, I still don't even know how to respond to that cause it's just so terrible,

2  but I have to fly out tomorrow to Buffalo, uh, for a couple of shows I have in Buffalo and

3  Rochester, but I'll be back on Sunday, and on Monday, I, uh, wanted to try to, uh, just get

4  with whoever I need to get . . ." STUART replied, "Well, there's, there's things out there

5  too, some, and, and I think a little bit nicer than some of those Kongs [phonetic], there

6  might be some like PK's [phonetic] and stuff out in that area too, so . . ." UM8040 and

7  STUART continue to talk about the unknown male's travel plans, where drug supplies are

8  located, and STUART tells UM8040 that he will give him five or ten of the new "Kongs."

9      220.    Based on my training and experience, I believe these two men are discussing

10  the distribution of marijuana. "Kong" and "PKs" are likely different strains of marijuana,

11  and is a term we have repeatedly heard during the wire intercepts. The references to and

12  complaints about weather difficulties is also a common thread during the intercepts;

13  because this DTO uses smaller private planes to move much of its product, it is

14  particularly impacted by bad weather, which can interfere with their ability to fly

15  controlled substances from one destination to another.

16      221.    Later in the call, UM8040 hands the phone to a different male, whom we

17  believe is OLSON. During the call, they initially talk about Christmas and gifts for their

18  kids. Later, OLSON tells STUART, "But hey, hey, this is looking really, really nice,

19  really good." STUART replied, "Nice." OLSON then said, "Yeah, I mean, like what I

20  just saw, you know, the kongs, the king kongs." STUART affirmed. Later, OLSON said,

21  "That is perfect. And I have got somebody else lined up." STUART replied, "I will send

22  a batch out there. I will send an old batch out there. I am going to snake some off those

23  guys." OLSON then said, "That is what I'm saying. I want him to have at least like

24  fucking fifty on hand to work with, you, know?" STUART then said, "Okay, well just

25  make sure when you . . ."

26      222.    Again, based on my training and experience and the investigation as a

27  whole, I believe STUART and OLSON are continuing to discuss marijuana quality and

28  quantities. "Fifty" here is probably a reference to fifty pounds.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 66

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

223.   STUART's and OLSON's voices overlap, and OLSON said, "But it is like I do not want, I don't even want him dealing with them fucking clowns." STUART replied, "Oh that is no problem." OLSON said, "You know, I mean, what do I need to do? You want me to come out here every time? I will do that, you know. If that is how it has to be, I will do that. I will come out here, I will collect it, you know, I will be able to." STUART replied, "I am gonna have those guys give them like . . ." OLSON interrupts, "I will meet, I will meet OG." STUART continues, "Ten, I am gonna have those guys give like ten. I do not know when he is gonna be back out there. He has got like some problems right now, but . . ."

224.   Again, the two men are continuing to discuss the distribution of marijuana to a customer, with "ten" likely a reference to ten pounds. "OG" is a code name or nickname for MURPHY, one of the pilots, and OLSON is offering to act as the intermediary between MURPHY and these customers.

225.   Later in the call, OLSON said, "And that is exactly, that is exactly how I see fucking KT, you know, is a fucking snitch . . .[H]e's fucking stolen from me, he, you know, he's stolen from fucking 'G,' I mean he has stolen from everybody dude." Again STUART affirmed. OLSON continued, "And you know 'G' is the only one that fucking backs him up." STUART then said, "We will talk. We will still . . . when are you coming home?" OLSON replied, "I am coming home tomorrow."

226.   This part of the call corroborates our belief that OLSON is working with BARBOUR in the Atlanta, Georgia area to distribute marijuana. "G" is a known nickname for BARBOUR, and we believe that "K.T." refers to Kai TYLER, one of BARBOUR's customers in that area. TYLER was supplied by Michael MURPHY on December 6, 2010

227.   Later in the call OLSON said, "He has got somebody in Windy's [code for Chicago, Illinois] too that fucking we wanna to set up." STUART mentions he has someone in "Windy's" too.

228.   To recap, based on my training and experience and from this investigation, I

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 67

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  believe that UM8040 and OLSON were both in Atlanta, GA, when speaking to STUART

2  during this call.  We believe OLSON is assisting Jacob STUART with distributing

3  marijuana in Atlanta, GA.

4      229.  SA Jack Wilson subsequently confirmed that OLSON flew back home from

5  Atlanta, GA, to Seattle, WA, on January 15, 2011.  Also, surveillance has observed

6  **OLSON's BMW**, registered to Trey OLSON at 5645 California Avenue SW #B, Seattle,

7  WA at his parent's house in West Seattle on two occasions since January 20, 2011.

8      230.  On January 16, 2011, Session No. 147, OLSON, using telephone number

9  206 518 2789, tells STUART that he has returned to Washington and that he has some

10 orders for him.  He tells STUART that he is in Southern Washington at a Best Western

11 hotel.  The following day, during Session No. 166, STUART callsOLSON asking if they

12 can meet up.  OLSON reminds STUART that he is out of town and tells him they will

13 meet on Tuesday.

14     231.  SA Jack Wilson confirmed that OLSON did stay at a Best Western located

15 in Washougal, WA.  This city is located in southern Washington just across the border

16 from Portland, OR.  When OLSON refers to "orders," I believe this to be for orders for

17 marijuana.

18     232.  Surveillance officers have more recently observed OLSON and his vehicles

19 at Mike's Auto Body, located at 9255 16th Avenue SW, White Center, WA.

20         a.   On January 24, 2011, at approximately 12:15 p.m., TFO Brad Turi

21 observed **OLSON's BMW** with Washington license ACE4066 parked at the business after

22 it departed from his father's residence, located at 8904 41st Avenue SW, Seattle, WA.

23         b.   On January 28, 2011, at approximately 3:15 p.m., TFO Turi observed

24 OLSON's silver Dodge truck with Washington license A28653T parked at the business

25 and also observed OLSON painting the building on the west side of the parking lot.

26         c.   On January 31, 2011, at approximately 9:45 a.m., TFO Turi observed

27 **OLSON's BMW** parked on the south side of Mike's Auto Body while OLSON was

28 working on the west side of the building.  At approximately 11:24 a.m., TFO Turi

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 68

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   observed as **STUART's GMC Yukon** arrived and pulled into the parking lot.  OLSON

2   entered the passenger seat and the GMC Yukon and departed northbound on Delridge Way

3   SW.  At approximately 11:54 a.m., the GMC Yukon returned to Mike's Auto Body, TFO

4   Turi observed as STUART exited the driver's seat and walked around the parking lot with

5   his young son and OLSON prior to departing the business in the GMC Yukon at

6   approximately 12:01 p.m.

7        233.    Based on the foregoing, I respectfully submit there is probable cause to

8   believe that OLSON is conspiring to, and actively engaged in, trafficking in marijuana and

9   potentially other controlled substances.  I also respectfully submit that there is probable

10  cause to believe that evidence of those offenses, as described in Attachment B, can be

11  found in **Olson's BMW**, as described in Attachment A.

12  **I.     STASH WAREHOUSE, 1621 Central Ave S #40, Kent, WA**

13       234.    The investigation to date shows that this warehouse unit is likely a stash

14  location for marijuana smuggled over the border from Canada.  Marijuana is stored there

15  until it is picked up by LAMAR for distribution to other members of the DTO.

16       235.    On February 23, 2011, TT3, Session 220, LAMAR, using 253-293-4947,

17  tells STUART, "Hey, I got the call for that new one."  STUART says, "Oh, shit. They

18  want you to do that right now?"  LAMAR says, "Yeah, they want me to go up and do that

19  in about ten minutes." The call continues, and both men discuss the PKs and the new

20  Wicked and Sours (again, strains of marijuana )they have. Later the call ends.

21       236.    Shortly thereafter, agents set up surveillance of LAMAR, who left his

22  apartment complex driving **Lamar's Truck**.  LAMAR drove to a restaurant in Kent, WA

23  and turned the truck over to an individual later identified as Joshua BENNETT (hereafter

24  BENNETT).

25       237.    BENNETT drove **LAMAR's truck** to Plemmons Industrial Park and into a

26  warehouse located at 1621 Central Avenue South #40, Kent, WA (the **Stash Warehouse)**,

27  backed the truck into unit #40 and closed the door.

28       238.    A few minutes later, BENNETT drove back out and returned **Lamar's**

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 69

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   **truck** to LAMAR.  LAMAR returned home to **Lamar's Apartment** and parked the truck

2   in the area of his garage, unit #62.

3       239.   A short time later, LAMAR returned to Kent and the process was repeated a

4   second time.  The second time, agents observed BENNETT and another male,

5   subsequently identified as Brent WORSTER, depart from the warehouse in LAMAR's

6   vehicle where they returned LAMAR's truck back to him.

7       240.   Agents believe that BENNETT or another member of the DTO contacted

8   LAMAR earlier to arrange the pick-up of a new shipment of drugs and BENNETT loaded

9   **LAMAR's truck** with marijuana at the warehouse, unit #40, twice, which LAMAR then

10   unloaded into his garage, unit #62.

11       241.   After the surveillance operations, later in the day on February 23, 2011, TT3,

12   Session #227, LAMAR tells STUART, "Got a lot of work to do." STUART laughs.

13   LAMAR is likely referring to the marijuana he has just received in addition to the other

14   tasks set by STUART.

15       242.   STUART later asks LAMAR "How's it going?" LAMAR tells him, "I'm just

16   breaking those six down right now. It's taking me forever." STUART asks LAMAR, "Did

17   you call those guys, the guys you gave the four to? And let them know you were going?"

18   LAMAR says, "No, I haven't. He needs them today? What time?" STUART confirms,

19   "Yeah, we're trying to get that because we're trying to open today." STUART later asks,

20   "Are you making them look pretty?" LAMAR tells him, "Yeah, I'm breaking them all

21   down. The Wicked ones are supposed to be the bomb; it's got a lot of leaves on it. I'm

22   weighing them a little bit over cause it looks like there's going to be, like, shake in the bag,

23   like one or two grams of it, cause it's dry and it's got a lot of leaves, but if you squish it

24   your fingers get sticky.  It's good, but there's something weird about it.  A lot of leaves."

25   STUART and LAMAR go on to discuss the price and the fact that LAMAR thinks he is

26   short on some.

27       243.   During previous calls, STUART has told LAMAR to deliver some nice

28   packages of supposed marijuana to the "store" and his business partner.  The investigation

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 70

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    has shown that STUART is involved with GroGro Hydro, a hydroponic and indoor garden

2    supply shop, which is located in Kirkland, WA. Agents believe STUART will be selling

3    some of the finer examples of his marijuana from this location. During this call they are

4    discussing LAMAR's packaging and preparations of the "retail" sales marijuana.

5       244. On March 9, 2011, SA McIntosh reviewed video recordings of the front

6    exterior of Unit #40 at the warehouse complex located at 1621 Central Avenue South,

7    Kent, WA, for March 8, 2011 and March 9, 2011, as well as tolls for a cellular telephone

8    believed to be held by BENNETT, or one of his associates, with telephone number

9    425-231-5506. SA McIntosh also reviewed the electronic surveillance records (GPS

10    tracker) of **LAMAR's truck**. The following observations were made by SA McIntosh

11    except where specifically noted that surveillance agents made the observation.

12       245. On March 8, 2011, at approximately 1:58 am, 425-231-5506 made an

13    outgoing call to a number in Canada, 778-982-2018.

14       a. At approximately 5:48 p.m., 425-231-5506 received an incoming call

15    from 778-982-2018.

16       b. At approximately 7:19 p.m., BENNETT's white Toyota Tundra

17    arrived at the **Stash Warehouse** and entered unit #40 through the garage door.

18       c. At approximately 8:28 p.m., the garage door opened and the white

19    Toyota Tundra pulled out and departed the warehouse facility.

20       d. At approximately 8:37 p.m., the white Toyota Tundra returned and

21    parked near unit #40 but out of view of the video camera angle. A short time later, a

22    person walked from the area where the truck was parked and entered unit #40 through the

23    front entrance door.

24       e. At approximately 11:42 p.m., a tractor trailer arrived at the **stash**

25    **warehouse**. The garage door to unit #40 opened, and the tractor trailer backed into the

26    unit.

27       f. At approximately 11:53 p.m., 425-231-5506 made an outgoing call to

28    778-982-2018.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 71

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    g. On March 9, 2011, at approximately 1:08 a.m., the garage door to unit

2 #40 opened, the tractor trailer pulled out and departed from the warehouse facility, and the

3 garage door closed.

4    h. A short time later, the garage door opened again and a person walked

5 out of the unit towards where the white Toyota Tundra was parked earlier and the garage

6 door closed again.

7   246. Based on the entirety of the investigation, including information supplied by

8 the CIs, and subsequent surveillance observations, we believe that this tractor-trailer

9 delivered Canadian marijuana to the **stash warehouse**. As set forth below, this suspected

10 marijuana was subsequently delivered to LAMAR.

11   247. On March 9, 2011, at approximately 10:36 am, 425-231-5506 made an

12 outgoing call to 778-982-2018. At approximately 11:39 am, 425-231-5506 made an

13 outgoing call to LAMAR's cellular telephone with telephone number 253-293-4947,

14 hereinafter referred to as LAMAR's phone.

15    a. At approximately 11:54 am, 425-231-5506 received an incoming call

16 from LAMAR's phone. At approximately 12:40 p.m., based on electronic surveillance

17 records, **LAMAR's Truck** departed from **Lamar's apartment** complex and traveled

18 north on Highway 167.

19    b. At approximately 12:54 p.m., the garage door to unit #40 opened and

20 the white Toyota Tundra was backed out of the unit.

21    c. At approximately 12:57 p.m., **Lamar's Truck** arrived at the Denny's

22 restaurant parking lot, located at 1246 North Central Avenue, Kent, WA. At

23 approximately 1:02 p.m., the truck departed from the Denny's and traveled south on

24 Central Avenue towards the **stash warehouse** facility.

25    d. At approximately 1:12 p.m., the garage door for unit #40 opened and

26 **LAMAR's truck** was backed into the unit with the garage door being left open.

27    e. At approximately 1:16 p.m., **Lamar's Truck** was driven out of the

28 unit, departed the warehouse facility, and arrived back at the Denny's at approximately

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 72

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  1:22 p.m.  A short time later, **LAMAR's truck** departed from the Denny's and traveled

2  south on Highway 167.

3         f.    At approximately 1:29 p.m., BENNETT's white Toyota Tundra

4  returned to the **stash warehouse** facility and parked in front of unit #40, the driver got out

5  and entered unit #40 wearing a dark colored hooded sweatshirt and a baseball cap.  Later

6  in the day, the driver of the white Toyota Tundra was identified as BENNETT by SA

7  Phillips.

8         g.    At approximately 1:42 p.m., **Lamar's Truck** arrived at **Lamar's**

9  **Apartment** complex and parked near his garage, unit #62.

10    248.   Based on the foregoing, although surveillance agents were not present to

11  verify the driver of **Lamar's Truck**, I believe that LAMAR drove his truck from his

12  apartment to the Denny's restaurant where he turned it over to BENNETT, who then drove

13  it to the warehouse unit #40, loaded it with marijuana and returned it to LAMAR at the

14  Denny's.  LAMAR then drove the truck to his apartment complex and stored the marijuana

15  in his garage, unit #62 as occurred during the surveillance on February 23, 2011.

16    249.   At approximately 1:56 p.m., **LAMAR's truck** departed from his apartment

17  complex a second time and traveled north on Highway 167.

18         a.    At approximately 2:13 p.m., BENNETT was observed walking out of

19  the front entrance door to the **stash warehouse,** unit #40, entered his white Toyota Tundra

20  and departed from the warehouse facility.

21         b.    A short time later, **LAMAR's truck** arrived again at the Denny's

22  restaurant.  At approximately 2:20 p.m., LAMAR's truck departed the Denny's parking lot,

23  while HSI SA Mike Gallegly observed LAMAR standing in the parking lot.

24         c.    SA Phillips followed **LAMAR's truck** south on Central Avenue and

25  observed as it was backed into the **stash warehouse,** unit #40 at approximately 2:28 p.m.

26         d.    At approximately 2:31 p.m., SA Phillips observed as **LAMAR's**

27  **truck** was driven out of unit #40, departed the warehouse facility, and traveled north on

28  Central Avenue back towards the Denny's.  SA Phillips was able to confirm that

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 73

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  BENNETT was the driver of **LAMAR's truck** from the warehouse facility back to the

2  Denny's parking lot, and the truck arrived in the parking lot at approximately 2:39 p.m.

3       e.    At approximately 2:41 p.m., SA Gallegly observed as LAMAR

4  departed from the Denny's parking lot in **Lamar's Truck** north on Central Avenue, and

5  BENNETT departed from the parking lot in his white Toyota Tundra south on Central

6  Avenue. LAMAR's truck then traveled south on Highway 167.

7       f.    At approximately 2:51 p.m., the garage door to the **stash warehouse**

8  unit #40 opened and BENNETT backed his white Toyota Tundra into the garage.  At

9  approximately 3:06 p.m., HSI SA Ken Dahlstrom observed as the garage door opened and

10  the white Toyota Tundra was driven out of the garage and parked in front of the unit with

11  the driver remaining in the vehicle.  A short time later, SA Dahlstrom observed as a

12  shorter white male with a dark colored sweatshirt and baseball cap exited the front door

13  entrance to unit #40 and got into the passenger seat of the white Toyota Tundra before it

14  departed from the warehouse facility.  SA Dahlstrom was able to confirm that the

15  passenger was the same white male that was observed with BENNETT at the warehouse

16  unit during the surveillance on February 23, 2011 when this same marijuana transaction

17  occurred.  SA Phillips was later shown a Washington Driver's License photo of the white

18  male passenger and positively identified him as Brent WORSTER (hereinafter

19  WORSTER).  Surveillance agents followed BENNETT and WORSTER in the white

20  Toyota Tundra as they took a very indirect route to I-5, while bypassing Highway 167.

21  Surveillance agents continued to follow BENNETT and WORSTER as they traveled north

22  on I-5 until surveillance was terminated at approximately 3:55 p.m.

23       g.    At approximately 3:10 p.m., **LAMAR's truck** arrived at his

24  apartment complex and parked near his garage, unit #62, where he presumably unloaded

25  marijuana he had picked up from BENNETT and possibly WORSTER.

26  **K.**    **SUSPECTED GROW OR STASH LOCATION, 2512 162 DR SE,**

27      **SNOHOMISH, WA**.

28      250.    The investigation has recently linked BENNETT to a possible grow or stash

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 74

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   location at 2512 162 Drive SE in Snohomish, Washington.

2       251.    During the intercepted calls, STUART and his confederates discuss moving

3   several different strains of marijuana, using names like "SDs" "Kongs," "Exotics," and the

4   like. I believe it is likely that some of these strains are smuggled over the border from

5   Canada, and some are grown here in Western Washington.

6       252.    In April 2010, Det. Nicole Richardson of the Snohomish Regional Drug

7   Task Force received a tip from Snohomish County Sheriff's Deputy Z. Devenney. Deputy

8   Devenney received information from a source ("Snohomish Source") that Burdick was a

9   large marijuana grower/distributor in Snohomish County. The Snohomish Source also

10   stated that Burdick grew out of warehouse type facilities and had numerous cars, houses

11   and always had plenty of cash on him. The Snohomish Source provided an address and

12   phone number for Burdick, 17531 51 AVE SE, Bothell and 425-314-1850. Deputy

13   Devenney was aware of this residence and believed it was a quite large house in a remote

14   part of Snohomish County.

15       253.    Detective Richardson later ran a criminal history check on Burdick, which

16   showed that he has two felony VUCSA convictions involving marijuana. Washington

17   Employment Security Department showed that Burdick had no reported employment

18   between January 2004 to December 2010. Department of Revenue records shows that

19   Burdick owned a business but that it was closed in 2007.

20       254.    Detective Richardson looked into the address Deputy Devenney originally

21   provided, 17531 51 AVE SE, Bothell. Per the Snohomish County Assessors records, the

22   house on 51st was never owned by Burdick and it appears that Burdick was living in it as a

23   rental at the time of the original tip in 2010. A PUD records check showed that between

24   January 2010 and August 2010 Andrea Poitras was the subscriber to this utility account.

25   The power consumption at this residence during Poitras' tenure was between 3,600 and

26   9,700 KWH (per 2 month billing cycle). In comparison to the tenant before Poitras and

27   afterwards, the tenant in April 2009 had a bill of 846 KWH and the tenant in March 2011

28   had a bill of 3,192 KWH. Poitras' bill for April 2010 was 9,700 KWH.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 75

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

255.   Det. Richardson also located a residence in Snohomish County that is currently owned by Burdick, 2512 162 DR SE, Snohomish, WA (hereafter, the suspected **grow location**).

256.   Det. Townsend looked into the financial aspects of this property purchase. Burdick purchased this residence in October 2006 for $540,000, making a $57,866 down payment and financing the remaining $486,000 of the purchase price. The down payment came in the form of a personal check drawn on Burdick's Boeing Employees Credit Union (BECU) account ending in 6499 for $5400 in earnest money. The second amount of $52,466 was in the form of a cashier's check from BECU from Burdick. Burdick's loan application states he is self employed by S&B Motorsports. He lists that he has $60,000 in a BECU account and no debts. In the mortgage documents, Burdick signs an Income Certification stating that his monthly income is $9033. This Income Certification stated that he was "not required to provide full, detailed documentation and proof of your monthly income. Instead we base our underwriting on your representation to us as to your gross monthly income". Burdick also signed an Occupancy Affidavit, stating that he would occupy this location or risk legal action for misrepresentation and acceleration of the loan repayment. Again, according to the investigation to date, Burdick has no reported source of income.

257.   When Det. Richardson drove by this house, which is located on one acre on a dead end road, she noted there was a large outbuilding behind the house. In the driveway, one vehicle was parked, WA Lic. 294ZWK. This vehicle came back registered to Bryan Hieronymus. Vehicles belonging to BENNETT and Poitras have also been seen on surveillance at this house.

258.   A criminal history check on Bryan Hieronymus shows he has eight felony convictions for VUCSA involving marijuana in 2004 and attempted money laundering. Hieronymus also shows no employment wages reported to Employment Security for the time frame of 2007-2010.

259.   Snohomish County Public Utilities (PUD) showed the power records for

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 76

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  Burdick's house at 2512 162 SR SE, Snohomish have changed names during Burdick's

2  ownership.  From October 20, 2006 to October 9, 2001, the subscriber was Jenniffer

3  Fowlds.  The usage on the property appears to be at a fairly typical rate from April 2009 to

4  October 2009 ranging from 2,150-3,300 KWH (per 2 month billing cycle).

5      260.   On October 9, 2009, Bryan Hieronymus became the new power subscriber.

6  While in his name, the majority of the payments have been made in cash.  In December

7  2009 there is a spike in power usage that continues to the present at ranges from

8  5,800-12,500 KWH (per 2 month billing cycle).  The following is a graph showing power

9  usage.

| Date | kWh Usage | Date | kWh Usage |
|------|-----------|------|-----------|
| 4/10/2009 | 3342 | 4/13/2010 | 5882 |
| 6/10/2010 | 2499 | 6/11/2010 | 10083 |
| 8/11/2009 | 2239 | 8/11/2010 | 6336 |
| 10/9/2009 | 2157 | 10/11/2010 | 10986 |
| 12/11/2009 | 10152 | 12/13/2010 | 12527 |
| 2/11/2010 | 10981 | 2/10/2011 | 11288 |

17      261.   From when Det. Richardson started doing regular drive-bys of this location

18  in March 2011 until present date, there has been a burgundy colored Jaguar parked in the

19  driveway at this house.  This vehicle is registered to Hieronymus.  On March 11, 2011, the

20  power subscriber at this residence changed from Hieronymus back to Jenniffer Fowlds

21  name.  Only one month has lapsed in Snohomish County PUD's normal 2-month billing

22  cycle since Fowlds took back over as the subscriber.  The power consumption at this

23  location is still high.  When Jenniffer Fowlds was the subscriber prior to Hieronymus, her

24  power consumption was also much lower than it is now.  Fowlds two month billing cycle

25  consumption in 2009 was nearly equivalent to what her consumption was between March

26  11, 2011 and April 12, 2011.  The following is a graph showing power usage:

| Date | kWh Usage | Length of billing period |
|------|-----------|--------------------------|
| 04/12/11 | 2982 | *** for One month only |

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 77

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

**PREVIOUSLY**

| | | |
|---|---|---|
| 04/10/09 | 3342 | Two months |
| 06/10/09 | 2499 | Two months |
| 08/11/09 | 2239 | Two months |
| 10/09/09 | 2157 | Two months |

262.    PUD subscriber records on Fowlds account shows she has used "Jacob

Berdick" with the phone number "425-314-1850" as a reference.  Based on local on police

records, Fowlds is believed to have once been in a dating relationship with Burdick.

263.    Det. Richardson knows through training and experience that marijuana

grown indoors requires grow lights, ballasts, fans, and exhaust fans that all require

electricity to operate.  Det. Richardson know that marijuana growers use 500 or 1000 watt

halide and/or high pressure sodium bulbs in their grows to imitate the natural sunlight on

the plants and grow shields to reflect the light better onto the plants.  Det. Richardson

knows that the lights are on the plants in cycles to imitate the natural sun and are on 12-18

hours a day.  Through training Det. Richardson knows that a 1000 watt bulb that is on 12

hours a day for 30 days will use 360 KWH.

264.    Snohomish County Auditors records shows that Burdick also owns a condo

located at 10901 84 ST NE #1, Lake Stevens, WA.  On a closer examination, this condo

appears to be a storage unit within a private facility.  Burdick purchased this unit in August

2006 for $35,000, financing $31,500 of the purchase price.  Burdick is also current on this

loan.

265.    While Det. Richardson looked at Burdick's criminal activities, Det.

Townsend looked further into Burdick's financial transactions.  In August 2007, an IRS

form 8300 was completed on Burdick.  This document is completed by a "financial

institution" when a payment of more than $10,000 in cash is made.  This document shows

that Burdick made a cash payment of $24,480 to attorney Bob Leen for the defense of

Corey Wirsz.  A records check of the federal case against Wirsz shows that he was

convicted of Conspiracy to Distribute Marijuana and sentenced to 78 months in July 2008.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 78

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

266.   Investigation shows that Burdick has accounts with Boeing Employees Credit Union. A review of the documents available show that Burdick made consistent cash deposits into his account during the same time period when he has no discernible source of income. In one two month span from December 2008 to February 2009, Burdick made 23 cash deposits totaling $30,860. In a second two month time span from April 2009 to June 2009, Burdick makes 8 cash deposits for a total of $25,803. In a 30 day period in June 2009, Burdick makes 10 cash deposits totaling $26,870. In a two month span from October 2009 to December 2009, Burdick made 14 deposits totaling $42,580. One particular transaction should be noted, on 12-7-09, Burdick deposits $13,500 (mostly $20 bills). He then turns around and immediately withdraws $10,000 in large bills. In the last two month span from February 2010 to April 2010, Burdick makes 9 cash deposits for a total of $27,400. Just for the examples given, which covers only 9 months of banking activity, Burdick deposits $153,513 in cash.

267.   In late February 2011, DEA Special Agent J. Wilson requested assistance from SRDGTF Det. Richardson regarding the STUART DTO. Agent Wilson advised that a vehicle belonging to Andrea Poitras (Burdick's girlfriend) has been seen on surveillance showing up at locations of interest in the Stuart case showing a connection between STUART and Burdick. In addition, DEA has obtained phone tolls on STUART and some of his confirmed co-conspirators. Based on information gained through his investigation, Special Agent Wilson believes that BENNETT is the middle man/facilitator between partners, Burdick and Hieronymus, as one local source of supply for marijuana to STUART.

268.   In March 2011, surveillance followed one of BENNETT's vehicle to Burdick's residence at the **suspected grow house**, 2512 162 DR SE, Snohomish.

269.   On March 23, 2011 investigators followed BENNETT from a house off of Dubuque Rd to ECO Enterprises. Det. Richardson know from training and experience that during the service of search warrants, the vast majority of marijuana growing operations have receipts from ECO Enterprises for the equipment used in the growing operation.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 79

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   ECO Enterprises is a business that markets and sells growing supplies, to include soil,

2   fertilizer, lights, ballasts, grow shields, etc.

3       270.   Surveillance has been conducted on Burdick and the **suspected grow house**

4   for the past two months.  It is still undetermined where he stays at night.  Based on recent

5   surveillance, Burdick has been observed driving a black Toyota 4Runner registered to

6   Andrea Poitras (previously reported as Burdick's girlfriend).

7       271.   On March 14, 2011, at approximately 3:04 p.m., SA Phillips and SA Nick

8   Bryson with DEA Seattle located BENNETT's white GMC Savana van parked at the

9   **suspected grow house**.  SA Phillips noted that the residence had a large outbuilding on

10  the property.  At approximately 3:15 p.m., SA Bryson observed as the white GMC Savana

11  van departed from the residence followed by a black Toyota 4-Runner with Washington

12  license plate 261WVD, registered to Andrea R. Poitras at 19631 131st Place NE, Granite

13  Falls, WA.  Both vehicles traveled in tandem through several miles of country roads

14  before arriving at the duplex residence located at 11730 51st Avenue NE, Unit B,

15  Marysville, WA.  GS Hudon observed as the black Toyota 4-Runner parked next to a

16  white Dodge Dakota that was already parked in front of Unit B.  Two white males exited

17  the Toyota 4-Runner and entered Unit B.  GS Hudon noted that the white GMC Savana

18  van parked in front of the detached shop unit, which is located directly to the south of the

19  duplex residence.

20      272.   At approximately 3:53 p.m., SA Phillips observed as BENNETT arrived at

21  the residence driving a 1991 Honda Accord with Washington license plate 356XQT,

22  registered to Josh S. BENNETT at 3707 Robe Menzel Road, Granite Falls, WA.  TFO

23  Swanson observed BENNETT produce a key to open the front entrance door to the

24  warehouse unit and enter the unit.  A short time later, SA Phillips observed as BENNETT

25  exited from the detached shop, walked to Unit B of the duplex residence, and entered

26  through the front door.

27      273.   At approximately 4:07 p.m., SA Phillips observed as two white males exited

28  from the garage door attached to Unit B and entered the Toyota 4-Runner.  GS Hudon

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 80

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  drove by the duplex residence and identified one of the white males as Jacob BURDICK

2  from an arrest photograph supplied by Snohomish County Detective Nicole Richardson.

3  Surveillance was terminated at approximately 5:00 p.m.

4      274.   On April 11, 2011, surveillance was conducted by the SRDTF at **Worster's**

5  **Residence,** 11730 51 AVE NE, #B, Marysville, WA.  At about 1000 hours, no vehicles

6  were at the location.  At about 1030 hours, a white truck arrived at the location.  This

7  vehicle is known to be associated with unit #B.  A short time later, a black Toyota

8  4Runner arrived.  Det. Rucker was able to confirm the license plate was, WA Lic.

9  #261WVD.  At about 10:39 a.m., this vehicle left.  Surveillance units followed this

10 vehicle.  It was occupied by one male.  At about 10:56 a.m., it stopped and parked in the

11 Frontier Village area of Lake Stevens, WA.  It parked near the Safeway store and the

12 tanning salon; Bahama Sun.  Det. Townsend observed the male driver exit the vehicle and

13 go inside Bahama Sun.  Det. Townsend said the physicals of the male were similar to that

14 of Jacob Burdick.  Also, she said he had a shaved head and was wearing a black colored

15 hoodie.

16     275.   At about 11:24 a.m., the male who had been in Bahama Sun exited and

17 returned to the 4-Runner.  He was followed to the fuel pumps and was there until about

18 1130 hours.  When he left the pumps, his vehicle was followed to the area of Burdick's

19 house on 162 DR SE.  At about 11:45 a.m., Det. Richardson drove by the **suspected grow**

20 **house** and observed the 4-Runner parked behind the house (between the house and barn).

21 Also at the location were BENNETT's white GMC van (behind the house) and Bryan

22 Hieronymus' Jaguar was in the driveway in front of the house.  Surveillance remained in

23 the area until about 12:45 p.m.  When there was no change, surveillance was terminated.

24     276.   On April 7, 2011, SA Wilson advised that BENNETT's Toyota Tundra

25 pickup truck, which had been in California for several days, was northbound through

26 Oregon.  Estimating his driving time to Marysville, Det. Richardson had surveillance in

27 position at BENNETT's house on 86 DR NE in Marysville and watching the 51 AVE NE

28 duplex/ shop in Marysville.  The truck was not seen at either location.  At about 11:55

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 81

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   a.m., Det. Richardson drove by the **suspected grow house**. BENNETT's truck was at this

2   location. Based on timing, it was assumed this was the first place BENNETT had gone

3   upon arriving back in Snohomish County. Surveillance was put onto this location and at

4   about 12:22 p.m., BENNETT's truck left the residence.

5       277.   On April 13, 2011, surveillance was conducted. At about 12:00 p.m., Det.

6   Richardson drove by the **suspected grow house**. At this location were Hieronymus'

7   Jaguar, BENNETT's white van, and the Toyota 4Runner driven by Burdick (registered to

8   Andrea Poitras). Surveillance units were moved to this location. At about 12:28 p.m., the

9   4 Runner left the location. It was followed to the Machias store located at OK Mill Road

10  and Machias Rd. A short time later, Det. Richardson observed what appeared to be

11  BENNETT's vehicle in the same area. Within minutes, Burdick's 4-runner was observed

12  heading back towards the **suspected grow house** and was later seen at that location.

13      278.   On April 19, 2011, surveillance was conducted by the SRDTF on

14  BENNETT and Burdick. SA Wilson advised that, based on intercepted phone

15  conversations between STUART and LAMAR, LAMAR would be going north to pick up

16  some marijuana. It was believed that BENNETT and Burdick may be the source of this

17  marijuana, based on past surveillance.

18      a.   At about 2:47 p.m., BENNETT's white GMC van and Burdick's black

19  4Runner left the driveway at the **suspected grow house**.

20      b.   At about 3:38 p.m., BENNETT's GMC van, and a vehicle repeatedly

21  known to be driven by Jacob Burdick, a black Toyota 4Runner, WA Lic. #261WVD,

22  arrived at **Worster's Residence**, at 11730 51 AVE NE, Marysville. Both vehicles parked

23  in front of the detached shop. The driver of the van appeared to be wearing a dark shirt

24  and pants and a white colored baseball type hat. The driver of the 4 Runner had a shaved

25  head, and resembled Burdick. The van was pulled up adjacent to the second most northern

26  most bay door and the Toyota 4Runner backed up to another bay door just to the south of

27  it.

28      c.   At about 3:48 p.m., Det. Richardson observed an unknown male place

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 82

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1   an item in the driver's side backseat of the 4Runner. She was not able to determine what

2   the item was nor could identify the male. At about 3:54 p.m., a dark colored passenger

3   vehicle arrived and parked near the shop, WA Lic. #356XQT. This Honda Accord

4   belongs to Joshua BENNETT. An unknown male exited this vehicle wearing dark pants, a

5   burgundy sweatshirt and a black baseball type hat.

6       d.      At about 3:55 p.m., BENNETT's van was pulled into a bay of the

7   shop and all the shop doors closed. At about this same time, SA Wilson advised Det.

8   Richardson that phone calls between STUART and LAMAR continued and they were still

9   waiting for LAMAR to meet to get the marijuana. A short while later, an unknown male

10  walked to BENNETT's Honda and accessed the driver's side then returned to the shop

11  within seconds.

12      e.      At about 4:07 p.m., SA Wilson advised that a phone call between

13  STUART and LAMAR indicated that LAMAR was going to have to go further north, but

14  that the deal would be taking place about 7:30 p.m.

15      f.      At about 1626 all three males exited the shop area. One returned to

16  BENNETT's Honda and left. The other two went to the 4Runner. Detectives followed

17  BENNETT's Honda as it left southbound. As the Honda passed through residential

18  neighborhoods, the vehicle was lost momentarily. SRDTF Det. M. Spellman later located

19  the HONDA at **BENNETT's residence**, 7914 86 DR NE, Marysville. Det. Spellman

20  advised that BENNETT's white Toyota Tundra was also at the location. Shortly thereafter,

21  Burdick's 4Runner, occupied by two unknown males, also left the 51 AVE NE duplex.

22  The vehicle was towing a utility trailer that had a lawnmower in it. This vehicle was not

23  followed. It was later seen via video surveillance at about 4:36 p.m. when the passenger

24  exited. It is uncertain if when the 4Runner left again how many occupants it contained.

25      g.      At about 5:59 p.m., surveillance showed that Burdick's 4Runner with

26  utility trailer in tow arrived at the **suspected grow house**.

27      h.      At about 7:05 p.m., DEA surveillance units, who had been following

28  LAMAR, advised they were northbound I-5 from Marysville. A short time later, they

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 83

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  advised they had followed LAMAR off the 88 ST Marysville exit and he had pulled into

2  the Haggen's shopping complex at 3719 88 ST NE, near a physical therapy office.

3          i.      At about 7:07 p.m., BENNETT's Toyota Tundra arrived at **Worster's**

4  **Residence,** 11730 51 AVE NE. It parked in front of a bay door to the garage. The bay

5  door was opened and the Toyota was backed partially inside. At about 7:13 p.m. the

6  Toyota exited the shop and left southbound. It was occupied by one person wearing a

7  black sweatshirt, dark pants and a black colored baseball type hat. SRDTF detectives

8  followed this vehicle to the same Haggen's shopping complex LAMAR was at. DEA

9  Agents kept surveillance on both LAMAR and BENNETT's vehicles.

10          j.      At about 7:19 p.m., DEA agents saw the vehicles were making

11  contact behind the Starbucks. At about 2 minutes later, they then advised that the drivers

12  swapped vehicles and **LAMAR's truck** was leaving. Ultimately, **LAMAR's truck**

13  arrived at **Worster's Residence,** 11730 51 AVE NE duplex at about 7:27 p.m. A bay door

14  on the detached shop was opened and agents were able to see LAMAR's truck inside.

15          k.      At about 7:33 p.m., LAMAR's truck left the shop and returned to

16  Haggen's shopping complex where it re-met with LAMAR at about 7:38 p.m. The drivers

17  swapped back to their respective vehicles and DEA keep surveillance in the lot. Both

18  vehicles left. It was later confirmed by intercepted calls that LAMAR had picked up the

19  previously arranged marijuana.

20       279.    On April 20, 2011 surveillance was conducted on the **suspected grow**

21  **house**. At about 9:00 a.m., Hieronymus' Jaguar and the 4-Runner commonly driven by

22  Burdick was parked in the driveway. Parked behind the house was a white Dodge pickup

23  truck. At about 10:34 p.m., a white crew cab Ford pickup truck arrived.

24          a.      At about 12:32 p.m. the Toyota 4Runner left the residence and at

25  about 12:33 p.m., the white Ford truck left. The white Ford truck was occupied by at least

26  two males. Later, Det. Richardson requested Snohomish County Sheriff's Office Deputy/

27  Detective Gibson to conduct a traffic stop on the vehicle and identify the occupants. At

28  about 2:00 p.m., Det. Gibson conducted the traffic stop. The driver and front seat

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 84

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

passenger identified themselves as Jason L. Weldon and Brent O. Worster, respectively.[5]
The back seat passenger refused to identify himself, but was later identified as Burdick,
based on a Snohomish County Jail booking picture. After the traffic stop, the truck with
the three occupants was eventually followed back to the **suspected grow house.** It left a
short time later and only two occupants were inside.

       b.    While mobile surveillance was being conducted on the Ford truck, per
the request of SA Wilson, SRDTF Detectives Spellman and Det. Heider went to the
**suspected grow house** to attempt to smell growing marijuana. They walked up the front
driveway and walked to the front door of the house. They knocked at the front door and
received no answer. Det. Spellman said the house is sparsely furnished and did not appear
lived in. They could not smell any marijuana from this location. They returned to the
driveway area and walked on the gravel driveway towards the large barn located
approximately 20 yards behind the house. They walked to the man-door on the south side
and knocked. Here they did not receive any answer either. They walked clockwise around
the barn passing by a barn door on the west and a barn door on the north. While passing
the barn door on the north side of the barn, both Det. Spellman and Det. Heider could
detect the odor of growing marijuana. They continued around the barn until they were
back on the east side and then walked back down the driveway and left the location. Both
Det. Spellman and Det. Heider, through their training and experience are aware of the odor
of growing marijuana.

      280.   Based on the foregoing, I respectfully submit there is probable cause to
believe that this location is being used to grow and/or store marijuana, at least some of
which has been and will be supplied to LAMAR and the STUART DTO. Accordingly, I
also submit there is probable cause to search this location.

---

    [5] As noted herein, WORSTER has been at the Stash Warehouse with BENNETT
prior to the marijuana deliveries to LAMAR.

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 85

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

**L.     7914 86 DR NE, MARYSVILLE, WA (Joshua BENNETT's RESIDENCE).**

281.    As set forth above, there is probable cause to believe that BENNETT is involved in supplying the STUART DTO with marijuana. According to Washington State DOL records, BENNETT resides at 7914 86th Dr NE, Marysville, WA 98270.

282.    On February 16, 2011, GS Hudon saw BENNETT accompanied by a female and two children, exit the 7914 86th Dr NE residence. BENNETT was seen kissing the female and then the female and children left the residence in a vehicle. BENNETT remained at the residence and appeared to be working on a vehicle in the garage.

283.    On March 10, 2011, GC Hudon saw BENNETT's Toyota Tundra parked outside on the 7914 86th Dr NE residence.

284.    On April 13, 2011, at approximately 11:30 a.m., surveillance officers observed someone matching the physical description of Joshua BENNETT playing with a remote control vehicle in his driveway of his residence of 7914 86th Drive NE, Marysville, Washington.

285.    I therefore respectfully submit there is probable cause to believe that BENNETT lives at this residence, and that evidence of the offenses identified above may be found at that location.

**M.     11730 51st AVE NE, UNIT B, MARYSVILLE, WA (Brent WORSTER) and unattached garage**

286.    There is also probable cause to believe that WORSTER is working with BENNETT and BURDICK, above, in supplying the DTO with marijuana. There is also probable cause to believe that this location, 11730 51st Ave. NE, Unit B, Marysville, Washington and the affiliated garage is both the residence of WORSTER as well as a possible stash location. The utilities for this residence are in the names of Lynda Robinson/Brent WORSTER.

287.    As set forth above, agents surveilled two exchanges between BENNETT and LAMAR on February 23, 2011. Based on the surveillance observations and intercepted calls, we believe BENNETT delivered marijuana to LAMAR. During the second

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 86

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1    exchange, WORSTER accompanied BENNETT.

2        288.   Agents were able to follow BENNETT and WORSTER back to **Worster's**

3    **Residence**, 11730 51st Ave NE, Unit B, Marysville, WA.  BENNETT backed his truck

4    into the front of the garage for this unit.  Both BENNETT and WORSTER entered this

5    residence.

6        289.   In addition, as set forth above, agents also saw BENNETT and WORSTER

7    in and out of this location during the exchange of vehicles (likely containing marijuana)

8    with LAMAR on April 19, 2011.

9        290.   Accordingly, based on my training and experience, there is probable cause to

10   believe that this residence and outbuilding will contain evidence of the drug trafficking

11   and related crimes engaged in by the DTO.

12                              **CONCLUSION**

13       291.   Based on my training and experience with controlled substance

14   investigations, and the facts set forth in this Affidavit, I believe that there is probable cause

15   for the issuance of search warrants for the residences, vehicles and businesses described

16   more particularly above, to search for marijuana, cocaine, drug paraphernalia, documents,

17   records, pay-owe sheets, electronic files etc., relating to the illegal distribution of

18   narcotics, false identification documents, currency, as well as firearms.  These items are

19   the fruits, evidence, and instrumentalities of crimes against the United States, specifically,

20   distribution and possession with intent to distribute controlled substances in violation of

21   21, U.S.C. § 841(a)(1); use of a communications facility in furtherance of a felony drug

22   offense in violation of 21, U.S.C., § 843(b); conspiracy to distribute and possess with

23   intent to distribute controlled substances, in violation of 21, U.S.C. § 846; interstate and

24   foreign travel to promote, manage, establish, carry on, or facilitate unlawful activity, in

25   violation of 18 U.S.C. § 1952; laundering of monetary instruments in violation of 18

26   U.S.C. 21 956; Bulk Cash Smuggling into or out of the United States in violation of 31

27   U.S.C. § 5332; and Importation of Controlled Substances in violation of 21 U.S.C. § 952.

28       292.   Based on the foregoing, I respectfully submit that probable cause exists to

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 87

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970

1  search the premises more particularly in Exhibit A, for evidence, fruits, and

2  instrumentalities for drug offenses, as described in Exhibit B.

3      293.   This is a multi-state investigation, with search warrants being executed

4  across the United States.  It is possible that not all of the search warrants will be executed

5  simultaneously.  Premature disclosure of the contents of this affidavit may put the larger

6  investigation at risk.  Accordingly, I respectfully ask that this application remain sealed

7  until further order of the Court.

8

9

10  BRYAN P. WINGER
    Special Agent

11  Homeland Security Investigations

12      SUBSCRIBED AND SWORN to before me this 26th day of April, 2011, by

13  Special Agent Bryan P. Winger

14

15

16  The Honorable James P. Donohue
    UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28

Affidavit of S/A Brian P. Winger in
Support of Search Warrant Application - 88

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
(206) 553-7970